*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-BG-633

IN RE BRANDI S. NAVE, RESPONDENT.

A Suspended Member of the Bar
of the District of Columbia Court of Appeals
(Bar Registration Number 490964)

FILED **03/08/2018**
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

On Report and Recommendation
of the Board of Professional Responsibility
(BDN-234-10, BDN-308-12, BDN-128-13 & BDN-186-13)

(Argued October 17, 2017                    Decided March 8, 2018)

*Brandi S. Nave*, pro se.

*Hamilton P. Fox*, *III*, Disciplinary Counsel, with whom *Wallace E. Shipp, Jr.*, Disciplinary Counsel at the time the briefs were filed, and *Jennifer P. Lyman*, Senior Assistant Disciplinary Counsel, were on the brief, for the Office of Disciplinary Counsel.

Before THOMPSON and BECKWITH, *Associate Judges*, and FARRELL, *Senior Judge*.

Opinion for the court PER CURIAM.

Opinion by *Associate Judge* THOMPSON, concurring in part and concurring in the order of discipline, at page 12.

PER CURIAM: The Board on Professional Responsibility (the Board)

recommends that respondent be disbarred from the practice of law in the District of

Columbia because of clear and convincing evidence that respondent intentionally misappropriated entrusted funds. District of Columbia Rule of Professional Conduct 1.15 (a). The Board relatedly concluded that respondent had committed thirty-four separate violations of Rule 1.15 (c) (failure promptly to deliver funds) and 1.15 (d) (failure to distribute funds).[1] We accept the Board's recommendation.

## I.

Respondent's conduct giving rise to the violations stemmed from her personal injury law practice and transactions that followed a common pattern, namely: respondent's clients received medical treatment from a chiropractor and signed (along with respondent) the medical provider's authorization and assignment form creating liens on the proceeds of any settlement amounts received by the client-patients from insurers. Respondent then negotiated a settlement with the involved insurance carrier, normally including also a reduction of the medical

---

[1] Hearing Committee No. 5 had likewise found that respondent committed misappropriation and the related violations, but concluded that the misappropriation was at most negligent — a conclusion the Board rejected on review.

bills by the treatment providers.[2]  During the time period at issue, respondent referred her personal injury clients to two different chiropractors or chiropractor clinics, Dr. Mohammed Yousefi and Medical Support Services (MSS). Respondent's failure to hold in trust and timely disburse funds received pursuant to these settlements and owed these providers formed the basis of the violations found by the Hearing Committee and the Board.

**A.**

Misappropriation is "any unauthorized use of [a] client's funds entrusted to [the lawyer], including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not [the lawyer] derives any personal gain or benefit therefrom."  *In re Anderson*, 778 A.2d 330, 335 (D.C. 2001) (internal quotation marks and citation omitted).  "Misappropriation happens when the balance in [the lawyer's] trust account falls below the amount due the client" or

---

[2]  The settlements were recorded on Client Disbursement sheets that, as the Board explained, were "precisely what they purport[ed] to be:  final documents reflecting the financial components of each settlement, containing the client's explicit approval of the disposition of settlement funds."

third persons to whom the client is indebted. *In re Ahaghotu*, 75 A.3d 251, 256 (D.C. 2013) (internal quotation marks and citation omitted).[3] The Board and the Hearing Committee both concluded that twice, first in the period from October 5– 8, 2012, and again on October 16, 2012, respondent's trust account balance fell below the cumulative amount of $41,893 owed to the two medical providers involved. Respondent contends that Disciplinary Counsel failed to prove this trust deficiency by presenting no "evidence of the actual dates [o]n which insurance checks were received [from the insurers] and deposited" in her trust account. Instead, respondent argues, Disciplinary Counsel relied on "circumstantial inferences" from the evidence that effectively "transfer[red] the burden of proof" to respondent to show that her trust account had funds sufficient to cover the amounts owed the medical providers.

We reject these arguments. First, as the Board recognized, the record reveals six instances of actual deposits of settlement checks to respondent's trust account at around the time corresponding settlement disbursement sheets reflect

---

[3] "Funds of clients *or third persons* that are in the lawyer's possession (trust funds) shall be kept in one or more trust accounts . . . ." District of Columbia Rule of Professional Conduct 1.15 (a) (emphasis added).

receipt of the funds from insurers. Further, as the Board properly determined from the record, respondent "repeatedly and insistently urged [before the Hearing Committee] that all settlement funds at issue . . . were timely deposited in her trust fund" contemporaneously with their receipt. Specifically, respondent testified that "it could be ten, fourteen days" between when the client signed the settlement sheet and when the check was received from the insurance company, and another "three or four days before [the check] can get to the bank." Indeed, she acknowledged that "the majority of the insurance companies" released the settlement funds before the disbursement sheets were signed. And in her Answer to the Specification of Charges, she likewise admitted that "on or about" the same dates she would both settle most claims with the insurers "and receive[] settlement funds." *See On or About*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "on or about" as "[a]pproximately; at or around the time specified"). Thus, by the time of the first alleged misappropriation from October 5–8, 2012, respondent's trust fund should have held funds equal to the outstanding debts to the two medical providers, but did not. Disciplinary Counsel offered convincing evidence that, although respondent owed the providers an aggregate of at least $40,893 for some nineteen selected cases as of August 1, 2012, by the alleged misappropriation dates

of October 5–8 and 16, she had in the trust account less than $37,000, when no disbursements for those cases had yet been made to the providers.

In attempting to show that Disciplinary Counsel had not established the necessary pre-October link between settlements and corresponding payments received from the insurers, respondent identified cases in which she argued that settlements were reached and payments received much later than the alleged October misappropriation dates. But in fact those cases regularly turned out to have followed this pattern: the medical provider would agree to reductions reflected on the disbursement sheets, then withdraw those reductions after respondent, though paid by the insurers, failed to pay the bills (often claiming "fraudulent" billing), whereupon either the provider would reinstate the reductions after further negotiation or the patients would be saddled with paying the balance. *See infra* Part II. The Hearing Committee thus found that the "19 cases relied on by [Disciplinary] Counsel as evidence of misappropriation were settled or had Client Disbursement sheets signed at least 46 days prior to October 5, 2012," and concluded that this was "clear and convincing evidence that the settlement checks for these 19 clients were received and should have been deposited in Respondent's trust account prior to October 5, 2012." At best, respondent has been able to

nibble at the edges of this conclusion, certainly not enough to persuade us that the Hearing Committee and the Board erred in finding from the discrepancy between client funds owed and possessed by respondent, and those maintained in the trust account, that respondent committed misappropriation.

**B.**

Respondent does not contend that she maintained more than one trust or escrow account, such that Disciplinary Counsel's proof rested on an incomplete picture of how she kept the funds received from insurers in escrow. Nor does she assert that funds received from the insurers and owed the medical providers were kept separate (uncommingled) in a way other than by deposit in her trust account. *Compare In re Ingram*, 584 A.2d 602, 603 (D.C. 1991) (no misappropriation because entrusted funds, though not deposited in trust account, were "kept . . . intact in the client's file"). Instead, to justify her failure to maintain the funds in trust or timely pay the obligations, respondent argues additionally that the providers, MSS especially, engaged in "fraudulent billing practices" in amounts they charged for services such as X-rays. But the Board and the Hearing Committee properly rejected this argument by pointing out (in the Hearing

Committee's words) that in "all of these matters, there is no evidence that any insurer or any third party challenged the accuracy or validity of the charges on MSS's bills" before agreeing to a settlement. As the Hearing Committee explained, respondent's duty to pay the providers once the insurers had settled "far outweighed her own interests in evaluating the accuracy and integrity of medical bills for which she had already received a settlement check." And, if respondent had any remaining dispute with a provider as to the correct amount to be disbursed for treatments, the proper course of action was for her to escrow the funds until the dispute was resolved, District of Columbia Rule of Professional Conduct 1.15 (d), which she failed to do.[4]

---

[4] The Hearing Committee found "duplicitous" respondent's argument that the entire amounts she owed the providers were in dispute. At the same time, the Board noted, even if one "were to credit [that] mistaken argument," respondent "would have had to maintain those greater amounts in escrow. . . . For the 19 clients at issue, the unreduced chiropractors' bills totaled more than $81,858, far in excess of the approximately $37,000 contained in the account on the relevant dates."

## II.

We also agree with the Board that respondent's misappropriation was intentional. The deficiency in respondent's trust account on the dates in question had to be viewed, as the Board recognized, against the background of respondent's "persistent pattern of withholding funds from third parties to whom those funds belonged." In the case of the monies owed Dr. Yousefi, respondent disbursed the funds after delays ranging from forty-one months to more than six years after the client approved payment (notwithstanding respondent's notation on some disbursement sheets that she had "pre-paid" the chiropractor). In the case of the MSS patients, in all but two matters respondent delayed at least nine months between receiving settlement funds and paying the provider. The Board found it significant that respondent's "intransigence in [paying MSS] actually prejudiced many of her clients," because she "exposed them to direct claims by MSS for payment of its bills (for which they remained responsible)" and even "increased that exposure because MSS, not having been paid, withdrew many of the invoice

reductions to which it had earlier agreed."[5]  The Board likewise considered, as bearing on respondent's intent, testimony concerning statements she had made to Dr. Yousefi about using funds owed providers to pay legal expenses in contentious personal litigation of her own.[6]

In sum, the Board unanimously determined by clear and convincing evidence that respondent's misappropriation, "part of a pattern of misconduct — including 34 discrete financially-based Rules violations — that transpired over the course of more than a year," when combined with her "fail[ure] to explain why [the] misappropriation took place"[7] and "utterly meritless excuses for her failures

---

[5]  The Board also agreed with the Hearing Committee that respondent's purported "investigation" of MSS for billing fraud (as the reason for the delayed payments) was not genuine; rather, the belated fraud claim was "triggered . . . by MSS's complaint to Disciplinary Counsel . . . ."

[6]  The Hearing Committee, despite its conclusion of negligence, found repeated instances of "threats and bullying [by respondent toward the providers] in her effort to clear her files of overdue payments."  Respondent's delay in paying bills for undisputed treatment, it said, was intended as "leverage to resolve all outstanding matters" and "demonstrate[d] an appalling callousness towards the duty she owed to the doctors."

[7]  The Board may properly consider, as part of the evidence bearing on whether Disciplinary Counsel has met its burden of proof, "an attorney's
(continued…)

promptly to pay her clients' medical providers," rose to the level of intentional misappropriation requiring disbarment. *See In re Addams*, 579 A.2d 190 (D.C. 1990) (en banc). The Board's report meticulously substantiates that conclusion, and we agree with it. Even if we were to conclude that respondent's indifference toward her obligations to the providers was reckless rather than intentional, the result would be the same. *In re Anderson*, 778 A.2d at 338.

Accordingly, it is ORDERED that respondent Brandi S. Nave is disbarred from the practice of law in the District of Columbia, effective thirty days from the date of this opinion. For the purpose of reinstatement, the period of disbarment will begin to run from the filing of the affidavit required by D.C. Bar R. XI, § 14 (g). *See* D.C. Bar R. XI, § 16 (c).

*So ordered*.

_____

(…continued)

explanation for — or conversely inability to explain satisfactorily — the use of a client's funds . . . ." *In re Thompson*, 579 A.2d 218, 221 (D.C. 1990).

THOMPSON, *Associate Judge*, concurring in part and concurring in the order of discipline: I readily agree with my colleagues and with the conclusion of the Hearing Committee and the Board on Professional Responsibility (the Board) that there is clear and convincing evidence that respondent committed numerous violations of Rule 1.15 (c) (failure promptly to deliver funds) and 1.15 (d) (failure to distribute funds). I have had a great deal more trouble agreeing that Disciplinary Counsel proved by clear and convincing evidence that respondent misappropriated client funds (and, under our case law, must be disbarred). Ultimately, I am persuaded that the record evidence supports the conclusion that respondent's trust account was out of trust on the dates Disciplinary Counsel alleged, but I write separately to explain why I have reached this conclusion. Along the way, I explain why I am not entirely satisfied with the reasoning on which the Board relied.

Disciplinary Counsel's proof of misappropriation consisted chiefly of evidence that it contends shows that by August 1, 2012, respondent owed the medical providers an aggregate of $41,893 for nineteen selected cases, but, on the dates of October 5–8 and October 16, 2012, had a balance in her trust account of no more than $36,780, even though no disbursements had yet been made to the medical providers for those cases. This evidence — showing that respondent's

escrow account was out of trust by $5,113 during the October 5–8 period and out of trust by $5,210 on October 16 — is summarized in a table on page 37 of the Board's Report and Recommendation ("Report").[8] The premise that respondent owed the providers the amounts shown on the table as of the "settlement dates" indicated is that once the client had signed a "disbursement sheet" (or "settlement sheet") approving the disposition of settlement funds, the amounts specified on the sheet were owed to the provider. The Board concluded that the disbursement sheets "clearly and convincingly establish[ed] the date[s] upon which [r]espondent received settlement funds" from the relevant insurance companies.

The Hearing Committee, however, found — and the hearing testimony supports its finding — that settlement checks might not be received until *after* the client signed the disbursement sheet.[9] The Board was "obliged to accept the

---

[8] Although the Hearing Committee found that respondent's escrow account was out of trust on October 5–8 and October 16, the Board stated that the latter out-of-trust date was October 19, which appears to be a typographical error. It appears that the three-day discrepancy would not alter the outcome of the Board's analysis, and it does not alter my own analysis.

[9] Respondent explained that the date the client signed the "disbursement sheet" was not "[t]he full and final settlement date." Rather, she testified, in some

(continued…)

[H]earing [C]ommittee's factual findings if those findings are supported by substantial evidence in the record, viewed as a whole." *In re Micheel*, 610 A.2d 231, 234 (D.C. 1992) (citing *In re Thompson*, 583 A.2d 1006, 1008 (D.C. 1990)). Accordingly, the Board should not have assumed that respondent received settlement funds on the "settlement dates" shown on the table at page 37 of the Board's Report. The Board stated that it had "definitively determined the dates upon which [r]espondent actually received settlement payments," but I do not believe the Board did so or was able to do so on the evidence presented.

_____

(…continued)

cases her office "g[a]ve [clients] the disbursement sheet to sign so [the office] can request . . . the check." Testifying about one of the disbursement sheets signed by a client, respondent explained that the document was "what we prepare for the client to give them a full view of what to expect if the case is settled. . . . [I]t just gives the client a full view, if everything pans out correctly, . . . [of] the amount that [the client] will be receiving." Thus, respondent testified, a disbursement sheet did not always mean that there had been a final settlement. Sometimes, respondent explained, she would "effectuate settlement, proposed settlement, to the client and [only thereafter] received the final offer from the insurance company." Also, according to respondent, provider's agreements to reduce their bills did not mean that a settlement was final; she testified that sometimes, if her office had "something close to a final offer" from the insurance company, the office would "ask for a reduction" from the provider. The Hearing Committee did not discredit (and, indeed, appears to have credited) such testimony.

As an alternative rationale for its conclusion that respondent had received insurance company funds by the dates shown on the table, the Board relied on what it referred to as respondent's "unequivocal[]" Answer to the Specification of Charges, in which she admitted that she received checks "on or about" specified dates (all of which were prior to the October 2012 putative out-of-trust dates). For example, respondent admitted in her Answer that "[o]n or about June 13, 2012, [she] settled a case on behalf of her client, Latia Proctor, and received settlement funds totaling $7,000"; that "[o]n or about June 19, 2012, [she] settled a case on behalf of her client, DeAngelo Wooten, and received settlement funds totaling $6,800"; and that "[o]n or about July 3, 2012, [she] settled a case on behalf of her client, Ayonia Allen, and received settlement funds totaling $16,500."

This court's case law, however, establishes that "the phrase 'on or about' encompasses more than the days immediately before and after the date alleged in an indictment or petition." *In re E.H.*, 967 A.2d 1270, 1274 n.6 (D.C. 2009) (citing *Williams v. United States*, 756 A.2d 380, 389 (D.C. 2000)); *see also Ingram v. United States*, 592 A.2d 992, 1007 (D.C. 1991) ("When an indictment charges that the offense occurred 'on or about' a certain date, . . . a defendant is on notice that a particular date is not critical."). "On or about" can cover a period several

months before or after the date specified. *See, e.g.*, *Pace v. United States*, 705 A.2d 673, 677–78 (D.C. 1998) (no prejudicial variance between indictment and evidence at trial when indictment charged that offense occurred on or about April 1994 and evidence at trial established that offenses occurred sometime during five-month period between late December 1993 and late May 1994). Accordingly, and especially in light of what the Board characterized as "the total disarray of [r]espondent's records,"[10] I do not believe that respondent's admissions to "on or about dates" can be taken as clear and convincing evidence that respondent had received insurance checks relating to many of the cases before the putative out-of-trust dates.[11]

---

[10] I note that Disciplinary Counsel did not charge a violation of Rule 1.15 (a), which "requires attorneys to keep 'complete records' of their trust account funds . . . 'so that the documentary record itself tells the full story of how the attorney handled client or third-party funds and whether the attorney complied with his fiduciary obligation that client or third-party funds not be misappropriated . . . .'"

[11] Respondent is correct that, as to some cases on which the Board relied for its conclusion of misappropriation, "[t]he record is devoid of evidence of the actual dates [o]n which insurance checks were received and deposited . . . ."

The Board, discussing Disciplinary Counsel's "'account balance' theory of proof" of misappropriation, stated that "the most appropriate means of proving [that] entrusted money [wa]s placed in an escrow account" is "direct proof" of individual deposits, something Disciplinary Counsel offered as to only five or six cases involved in this matter. The Board did not hold Disciplinary Counsel to that standard, however, because of what it described as respondent's "repeated[] and insistent[] urg[ing] that all the settlement funds at issue in this case were timely deposited in her trust account." The more fundamental issue in this case, however, is not whether respondent timely deposited settlement funds when received but when she actually received them from the insurance companies.[12] Disciplinary Counsel asserts that it had respondent's trust account records and could have introduced additional proof about the dates when respondent received insurance company settlement funds. Given the "gravity with which th[is] court views intentional misappropriation," and the "harsh[ness]" of the sanction for

---

[12]  As the majority opinion notes, respondent did testify that settlement checks might not be received for up to two weeks after the client signed a disbursement sheet, but she also testified that when a check was received from the insurance company "just really depends," and that her office had "seen different variations."

misappropriation "in comparison to sanctions for other disciplinary violations involving conduct some may view as roughly equivalent misconduct,"[13] I believe that as a general rule, Disciplinary Counsel should introduce such evidence when it is available. Disciplinary Counsel's failure to do so appears to have led the Board to rely on shortcuts such as those described above, which, in my view, do not amount to clear and convincing evidence of misappropriation.

I have looked deeper into the record evidence for other evidence of dates by which respondent received funds that Disciplinary Counsel alleged and the Hearing Committee and Board found she misappropriated.[14] I have focused on cases in which clients signed disbursement sheets in 2012, within six months of the putative out-of-trust dates (such that respondent could possibly have received settlement funds "on or about" the dates when the clients signed their disbursement

---

[13] *In re Addams*, 579 A.2d 190, 198 (D.C. 1990) (citations omitted). This court has said that there is "nothing worse" than misappropriation of client funds, *id.* at 194 (citation omitted), and that "[s]uch misconduct demonstrates absence of the basic qualities for membership in an honorable profession." *Id.* at 193.

[14] In this case, I believe this level of scrutiny is required given that there was "no evidence that [respondent] withdrew any money for her own use" and "no evidence that [she] benefited financially from the [alleged] unauthorized use."

sheets but *after* the putative out-of-trust dates). I have looked for evidence of whether the clients had received settlement checks before the putative out-of-trust dates, on what I believe is a reasonable assumption that respondent would not have issued a settlement check to a client if she had not received payment from the relevant insurer.

As to clients Barbara Brown, Bernadine Ramsey, Ishara Cormack, Leroy Stroy, and Dajuan Gant, there is hearsay evidence that they received their settlement disbursements by August 2012.[15] Specifically, the record contains notations by a Medical Support Services (MSS) investigator memorializing the client's (or a relative's) confirmation that the client received a settlement check by August 22, 2012 (or, in the case of Stroy, a disbursement sheet notation about a client "[d]isbursement received on July 19, 2012"). On the basis of this evidence, I am satisfied that respondent received funds from the insurers involved in these

---

[15] The Hearing Committee found that evidence was presented regarding when respondent's clients were paid in only five cases. The Board describes such evidence as being offered in six cases rather than in five as noted by the Hearing Committee. These findings overlook the hearsay evidence, which "is admissible in attorney disciplinary proceedings." *See In re Cater*, 887 A.2d 1, 6 (D.C. 2005).

clients' cases that should have been in her trust account by the October 2012 out-of-trust dates.

The record contains no such hearsay evidence pertaining to respondent's clients Latia Proctor, DeAngelo Wooten, and Ayonia Allen.[16] The record also provides a basis to question whether respondent received funds relating to these three clients by the putative out-of-trust dates. The Hearing Committee heard evidence showing that in November 2012, Erik Tyrone, an attorney for two of the medical providers, "signed a number of documents authorizing . . . reduction[s] in

---

[16] The table at page 37 of the Board's Report indicates that respondent owed chiropractors $2,400 as to Ms. Proctor, $2,400 as to Mr. Wooten, and $1,000 as to Ms. Allen. The record also shows that Ms. Proctor and Mr. Wooten's telephone numbers were either "disconnected" or the "wrong number" and that Ms. Allen did not return telephone calls, and that an investigator working on August 22, 2012, was unable to reach these clients (and thus was unable to verify, as the investigator did with some other clients, that they had received their checks as of that date).

There is no clear record basis for the Board's statement that respondent "received the $7,000 settlement payment for [Ms. Proctor's] claim on June 12, 2012, when the client . . . signed a disbursement sheet"; no basis for the Board's statement that respondent "received a settlement payment of $6,800 [for Mr. Wooten's claim] on June 19, 2012" when Mr. Wooten signed a disbursement sheet; and no basis for the Board's statement that "[r]espondent received $16,500 in settlement funds on July 3, 2012 [for Ms. Allen's claim.]"

the [provider's] bill[s]" for these (and some other) clients. Respondent explained — in testimony that the Hearing Committee did not discredit — that "[i]n most cases [in which Mr. Tyrone signed off on reductions] we hadn't even finished negotiating . . . . So no, the settlement check was not in our office" (with the result that respondent "couldn't pay [herself] either").[17] If, by the putative out-of-trust dates, respondent had not yet received from the insurance companies the total of $5,800 owed to the medical providers for services provided to Proctor, Wooten, and Allen, that would eliminate the putative out-of-trust amounts of $5,113 and $5,210.

I am satisfied, however, that the record supports an inference that respondent received insurance funds in the Proctor and Allen cases prior to the October 2012 putative out-of-trust dates. The record shows that Mr. Tyrone's reductions to the bills in these cases merely reinstated reductions to which MSS had earlier agreed on behalf of itself or on behalf of Dr. Inder Chawla and Gamma Technology, for which MSS did the billing. For that reason, it can reasonably be inferred that the

---

[17] Respondent further testified, "[T]here were cases that were not settled, that we could not settle, until we had these reductions signed by Mr. Tyrone."

Proctor and Wooten cases were not among the cases that respondent had been unable to settle before November 2012. Also, both Proctor and Wooten received settlement checks from GEICO, an insurer that respondent testified generally sent its checks even before the clients signed their disbursement sheets. Thus, it can reasonably be inferred that respondent received the $4,800 owed to providers on behalf of Proctor and Wooten prior to October 2012.

The Allen case is also one as to which the November 2012 reduction made by Mr. Tyrone reinstated a reduction to which MSS had agreed months earlier. However, the disbursement sheet for Ms. Allen shows that her agreed-to settlement was conditioned on a reduction of a bill from "Slade Healthcare Inc." (a reduction from $4,470 to $2,200), and the record does not show whether that provider had already agreed to the reduction or whether it was still a subject of negotiation at the time Allen signed the disbursement sheet on July 3, 2012, or even by the October out-of-trust dates. Thus, in my view, the evidence is less than clear and convincing that the $1,000 owed to MSS on behalf of Allen had been received by respondent before the October out-of-trust dates. For that reason, I do not accept the Board's finding that the out-of-trust amounts were $5,113 and $5,210. The record supports

a finding by clear and convincing evidence that the out-of-trust amount was somewhat lower.

In the end, I conclude that the record evidence as a whole is clear and convincing that respondent's escrow account was out of trust on the dates in question, and thus that a finding of misappropriation is warranted.[18] Because I do not take issue with the Board's finding that the misappropriation was intentional or at least reckless, I concur in the judgment disbarring respondent.

---

[18] It is sometimes difficult to measure what constitutes clear and convincing evidence, but I am guided here by the rule that even under the more stringent beyond-a-reasonable-doubt standard applicable to criminal cases, the prosecution "need not negate every possible inference of innocence" and "[t]he evidence need not compel a finding of guilt" to be sufficient for conviction. *Long v. United States*, 156 A.3d 698, 712 (D.C. 2017) (citation omitted).