*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-BG-633

IN RE BRANDI S. NAVE, RESPONDENT.

A Suspended Member of the Bar
of the District of Columbia Court of Appeals
(Bar Registration Number 490964)

On Report and Recommendation
of the Board of Professional Responsibility
(BDN-234-10, BDN-308-12, BDN-128-13 & BDN-186-13)

(Argued October 17, 2017                              Decided November 29, 2018)

*Brandi S. Nave*, pro se.

*Hamilton P. Fox*, *III*, Disciplinary Counsel, with whom *Wallace E. Shipp, Jr.*, Disciplinary Counsel at the time the briefs were filed, and *Jennifer P. Lyman*, Senior Assistant Disciplinary Counsel, were on the brief, for the Office of Disciplinary Counsel.

Before THOMPSON and BECKWITH, *Associate Judges*, and FARRELL, *Senior Judge*.

Opinion for the court PER CURIAM.

Dissenting opinion by *Senior Judge* FARRELL at page 25.

PER CURIAM: The court's original opinion in this matter was issued on March 8, 2018. After its issuance, respondent Brandi Nave petitioned for rehearing and rehearing en banc. On June 21, 2018, an order denying the petitions

was issued prematurely and, we have determined, improvidently. Accordingly, the order of June 21, 2018, denying respondent's petition is hereby withdrawn. Upon consideration by the full Division of the petition for rehearing, a majority of the Division has determined to grant the petition[1] and to issue this amended opinion.[2] The opinion reported at 180 A.3d 86 (D.C. 2018) is hereby vacated. The petition for rehearing en banc is denied as moot.

**I.**

---

[1] We have not simply "changed our mind," as our dissenting colleague suggests. *Post* at 25. Rather, we have acted upon a recognition that, as respondent pointed out in her Petition for Panel Rehearing, the original majority opinion and concurrence, like the Hearing Committee and the Board on Professional Responsibility (the "Board"), "overlooked and misquoted material [portions of] [r]espondent's testimony."

[2] Before the court had determined to withdraw the prematurely issued order, respondent filed a motion to reconsider the denial of her petitions (the "motion to reconsider"); at the court's direction Disciplinary Counsel filed a response in opposition; and, without leave of court respondent lodged a reply to that response. The lodged reply is hereby stricken as procedurally improper. We also decline to consider respondent's now-moot motion to reconsider. We do note, however, that the persistence it reflects is rooted in the same concern — i.e., that the Hearing Committee, the Board, and this court misconstrued some of the evidence — that has caused the Division to issue this amended petition.

The Board recommends that this court disbar respondent from the practice of law in the District of Columbia on the ground that on multiple occasions she violated Rules 1.15 (a), 1.15 (c), and 1.15 (d) of the Rules of Professional Conduct and that she intentionally misappropriated entrusted funds. We reject the recommendation to disbar respondent because we conclude that the finding that she misappropriated funds is not supported by clear and convincing evidence. We accept the Board's conclusion that respondent violated Rule 1.15 (a) by failing to place the funds of a third party in trust, violated Rule 1.15 (c) by failing to deliver promptly funds that a third party was entitled to receive, and violated Rule 1.15 (d) by failing to timely distribute funds.[3] For that misconduct, we impose a one-year suspension.

## II.

---

[3] Disciplinary Counsel also charged that respondent violated Rule 8.4 (c), asserting that she was "dishonest with the health care providers by failing to make promised payments or by paying years later." The Hearing Committee did not find clear and convincing evidence of dishonesty. Disciplinary Counsel did not file an exception to that determination, and the Board found it unnecessary to discuss the issue.

Respondent's charged conduct relates to her representation of clients in personal injury matters, which typically followed a common pattern in her "high-volume" practice. Namely, respondent's clients received medical treatment from a chiropractor and signed (along with respondent) the medical provider's authorization and assignment ("A&A") form creating liens on the proceeds of any settlement amounts received by the client-patients from insurers. Respondent would then gather the medical records and expenses, put together a demand package to send to the insurance company, and negotiate a settlement with the involved insurance carrier, which would typically offer to settle the claim in an amount sufficient to pay some but not all of the chiropractor's bills. The final settlement typically reflected a reduction of the medical bills by the treatment providers.

During the time period at issue, respondent referred her personal injury clients to two different chiropractors or chiropractor clinics, Dr. Mohammed Yousefi and Medical Support Services ("MSS"). Providers' complaints about respondent's failure to timely make payments to them led to an investigation by Disciplinary Counsel and then to proceedings before Hearing Committee No. 5 and the Board. The Board and Hearing Committee recounted the evidence that in some

cases years passed between the chiropractor's agreement to a reduced payment or the client's approval of a proposed settlement and respondent's actual disbursal of funds to the chiropractor, and that in many cases respondent paid the chiropractors months or even more than a year after she paid settlement amounts to the clients-patients following her receipt of funds from the insurance companies. The Hearing Committee, whose factual findings the Board accepted, found that respondent's "standard practice was to ignore the fiduciary duty she accepted by signing the A&As and to engage in post-settlement hard bargaining with third parties to whom she owed an ethical obligation," essentially using her delay in paying bills "as leverage to resolve all outstanding matters." In addition, in at least one case, respondent delayed depositing an insurance company check for two years, i.e., so long that she had to request a replacement check.

The Board's and Hearing Committee's conclusion that respondent violated Rule 1.15 by failing to make timely payments does not necessitate extended discussion. The Board found that respondent made "utterly meritless excuses for

her failures promptly to pay her clients' medical providers."[4]  The Hearing Committee found that respondent "demonstrate[d] an appalling callousness towards the duty she owed to the doctors."  Upon our review of the record, we agree that Disciplinary Counsel proved by clear and convincing evidence that respondent, through her payment practices with respect to the chiropractors, violated her obligations under Rule 1.15 (a), (c), and (d).

## III.

We conclude, however, that Disciplinary Counsel did not meet its burden of proof as to the charge of misappropriation.  Misappropriation is "any unauthorized use of [a] client's funds entrusted to [the lawyer], including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not [the lawyer] derives any personal gain or benefit therefrom."  *In re Anderson*, 778 A.2d 330, 335 (D.C. 2001) (internal quotation marks and citation omitted); *In re Abbey*, 169 A.3d 865, 869 (D.C. 2017) (involving misappropriation of funds that were to be paid to clients' medical providers).  One circumstance in which

---

[4]  Respondent claimed, for example, that she had identified a variety of billing irregularities that she needed to resolve before paying the medical providers.

misappropriation occurs is "when the balance in [the lawyer's] trust account falls below the amount due [to] the client" or third persons to whom the client is indebted. *In re Ahaghotu*, 75 A.3d 251, 256 (D.C. 2013) (internal quotation marks omitted).[5]

The Hearing Committee found "no evidence that [respondent] withdrew any money [from her trust account] for her own use."[6] The Board and the Hearing Committee both concluded, however, that during the period from October 5–8, 2012, and again on October 16, 2012, respondent's trust account balance fell below the cumulative amount of $41,893 owed to Dr. Yousefi and MSS. Disciplinary

---

[5] "Funds of clients *or third persons* that are in the lawyer's possession (trust funds) shall be kept in one or more trust accounts[.]" District of Columbia Rule of Professional Conduct 1.15 (a) (emphasis added).

[6] In reaching its conclusion about intentional misappropriation, however, the Board did consider Dr. Yousefi's testimony to the effect that respondent had made statements to him about using funds owed to providers to pay legal expenses she had incurred in contentious personal litigation in which she was involved. Respondent disputed Dr. Yousefi's allegation. The Hearing Committee found Dr. Yousefi's testimony "credible," but observed that Dr. Yousefi "did not purport to have such knowledge of [r]espondent's finances to make this statement based upon anything other than a logical assumption" and concluded that "Dr. Yousefi's assumption is not clear and convincing evidence sufficient to support a finding of intentional misappropriation." The Hearing Committee did *not* find by clear and convincing evidence that respondent misused funds owed to Dr. Yousefi.

Counsel offered evidence that on those dates (the "putative out-of-trust dates"), respondent's trust account held less than $37,000, when no disbursements for those cases had yet been made to the providers.

The Board recognized that to proceed as Disciplinary Counsel did "on the 'account balance' theory of proof, Disciplinary Counsel must show that the attorney actually deposited entrusted funds into escrow."[7] The Board also recognized that "the most appropriate means of proving [that] entrusted money [wa]s placed in an escrow account" is "direct proof" of individual deposits, a methodology that the Board said is the methodology it "expect[s] Disciplinary Counsel regularly to employ." The Board found, however, that Disciplinary Counsel had offered such direct evidence in only "six" of the "19 selected cases" Disciplinary Counsel relied on to prove misappropriation (based on the aggregate trust account balance and outstanding-payment-owed-to-providers approach). As the Board noted, the Hearing Committee "felt unable to determine exactly when [r]espondent received settlement payments from the insurance carriers."

---

[7] The Board cited *In re Edwards*, 808 A.2d 476, 484 (D.C. 2002) ("The fact that the balance in the escrow account fell below $ 430.86, the amount [that was to be paid to a third-party on behalf of client White] is without significance because the White money was not deposited in that account.").

Whether Disciplinary Counsel proved by clear and convincing evidence that respondent had actually received checks from the insurance companies as to all of the "19 selected cases" by the putative out-of-trust dates was a central issue during oral argument before the Board.[8]  Disciplinary Counsel's theory was that "the date of the settlement sheet [or "client disbursement sheet" signed by respondent's clients] equates to the date that [respondent] had the funds in her possession."  A Board member recognized, however, that "the full and final settlement date is usually the date of the release[,] . . . not the [date of the] disbursement sheet," and Disciplinary Counsel acknowledged that the releases were not introduced into the record.  Respondent's counsel told the Board that the evidence thus did not allow the Board to "know when the insurance company cut the check, . . . when they sent it [to respondent], and . . . when Ms. Nave deposited it."

In its Report and Recommendation, the Board found that "[t]here is no ambiguity as to the dates upon which [r]espondent received the settlement monies

---

[8]  We do not, as our colleague states, dismiss the Board's reliance on respondent's representation that she timely deposited all settlement funds in her trust account.  *Post* at 26.  Our concern is with when respondent *received* the settlement funds for certain clients as to whom the record contains no evidence from which the date of receipt can be convincingly inferred.

in any of the[] cases, because her Answer to the Specification of Charges . . . unequivocally," "definitively," and "clearly and convincingly" established the dates. The Board's statement was a reference to the fact that, in her Answer, respondent admitted that she received insurance checks "on or about" specified dates, all of which were prior to the October 2012 putative out-of-trust dates. For example, respondent admitted in her Answer that "[o]n or about June 13, 2012, [she] settled a case on behalf of her client, Latia Proctor, and received settlement funds totaling $7,000"; that "[o]n or about June 19, 2012, [she] settled a case on behalf of her client, DeAngelo Wooten, and received settlement funds totaling $6,800"; and that "[o]n or about July 3, 2012, [she] settled a case on behalf of her client, Ayonia Allen, and received settlement funds totaling $16,500."

We reject the Board's analysis on this point. To begin with, respondent filed her Answer before she knew that Disciplinary Counsel would attempt to prove his misappropriation theory on the basis of the account balance methodology rather than through what the Board termed "the most appropriate" means of proof, "direct proof of individual deposits," the methodology the Board "expect[s] Disciplinary Counsel regularly to employ." Respondent had no reason to know that more precision in her answers about dates was critical (and, if her records were in the

"disarray" Disciplinary Counsel asserted, she may not have known the precise dates when payments were received).

Further, this court's case law establishes that "the phrase 'on or about' encompasses more than the days immediately before and after the date alleged in [a charging document]." *In re E.H.*, 967 A.2d 1270, 1274 n.6 (D.C. 2009) (citing *Williams v. United States*, 756 A.2d 380, 389 (D.C. 2000)); *see also Ingram v. United States*, 592 A.2d 992, 1007 (D.C. 1991) ("When an indictment charges that the offense occurred 'on or about' a certain date, . . . a defendant is on notice that a particular date is not critical."). At least in some circumstances, "on or about" can cover a period several months before or after the date specified. *See, e.g.*, *Pace v. United States*, 705 A.2d 673, 677–78 (D.C. 1998) (no prejudicial variance between indictment and evidence at trial when indictment charged that offense occurred on or about April 1994 and evidence at trial established that offenses occurred sometime during five-month period between late December 1993 and late May 1994).

Accordingly, and especially in light of what Disciplinary Counsel characterized as "the total disarray of [r]espondent's records," we conclude that

respondent's admissions to "on or about dates" cannot be taken as clear and convincing evidence that she had received insurance checks relating to all of the 19 cases before the putative out-of-trust dates. Respondent is correct that, as to most of the cases on which the Board relied for its conclusion of misappropriation, "[t]he record is devoid of evidence of the actual dates [o]n which insurance checks were received and deposited[.]"

Unable to determine in most cases the exact dates when respondent received settlement payments from the insurance carriers or when clients were paid, the Hearing Committee "looked to the dates of the [client] disbursement sheets" that respondent's clients signed to approve proposed settlement amounts and payments.[9] and the Hearing Committee reasoned that respondent must have received the insurance payments and thus should have paid the providers within 90 days of the signed settlement sheet dates. Citing but misstating respondent's

---

[9] The Board found that the client disbursement sheets were "documents reflecting the financial components of each settlement, containing the client's explicit approval of the disposition of settlement funds."

Testifying about one of the client disbursement sheets, respondent explained that the document was "what we prepare for the client to give them a full view of what to expect if the case is settled. . . . [I]t just gives the client a full view of, if everything pans out correctly, . . . [of] the amount that [the client] will be receiving."

testimony, the Hearing Committee stated that "[r]espondent testified that the settlement check [from the insurers] may not be received for up to two weeks after the client signs the [c]lient [d]isbursement sheet and that the actual deposit can take a few more days." On that basis, and on the ground that there were signed client disbursement sheets in each of the 19 cases well before to October 5, 2012 (the earliest of the putative out-of-trust dates), the Hearing Committee found clear and convincing evidence that the settlement checks in all 19 cases relied on by Disciplinary Counsel as evidence of misappropriation "were received and should have been in [r]espondent's trust account prior to October 5, 2012."

It is true that in five cases the date of the signed settlement sheet and the date when respondent paid her client (and thus, it can reasonably be inferred, must have already received the insurance check) were only several days apart. For example, the Hearing Committee found and the documentary evidence shows that client Tiffany Quarles signed the Client Disbursement sheet accepting a net disbursement of $4,523.29 on January 27, 2012, and that she received her check a week later. The Hearing Committee found and the documentary evidence shows that Client K'Vonte Petty signed her disbursement sheet on March 14, 2012, and received her check on March 23, 2012. The evidence was similar as to clients Tony Jones

(check received four days after client signed disbursement sheet), Barbara Brown (check received nine days after client signed disbursement sheet), and Ishara Cormack (check received nine days after client signed disbursement sheet). However, the Hearing Committee found that evidence was presented regarding when respondent's clients were paid in only those five of the 19 cases.[10] Thus, for the majority of cases, the record does not permit an inference that insurance company payments were received by the date the client signed, or within days of the client's signing, the client disbursement sheets. Substantial evidence does not support the Board's finding that in all 19 cases, the signed disbursement sheets "evidence[d] [respondent's] actual receipt of funds."

Nor does respondent's testimony support that conclusion. As noted above, see *supra* n. 1, and as respondent's petition for rehearing emphasizes, the Hearing Committee misstated respondent's testimony. Respondent testified that "it could be ten, fourteen days" between when the client signed the "release" (*not* when the client signed the disbursement sheet, as the Hearing Committee misstated) and when the check was received from the insurance company. Respondent further

---

[10]   Moreover, the Board found that there was direct evidence as to when respondent deposited insurance company checks in escrow in only six cases.

testified that with respect to "the majority of the insurance companies," "the release [*not* the client disbursement sheet, as the Hearing Committee misstated] is signed after the check is received[,]" noting that "the insurance company may send the check with the release.[11] (Our original opinions, too, failed to appreciate the distinction respondent drew in her testimony between a "release" and a "disbursement sheet" signed by the client.) Thus the testimony not does support the Hearing Committee's statement that in every case, "[o]nce the client had signed [the client disbursement sheet signifying] his or her acceptance of the net disbursement in 'full and final settlement,' the amounts listed on the [c]lient [d]isbursement sheets for payment to medical providers became third-party property captive in [r]espondent's escrow account."[12] It likewise does not support the Board's statement that "[r]espondent deposited the last of the relevant

---

[11] Respondent's testimony also suggested why, in some cases, very little time passed between when the client signed the disbursement sheet and when the client was paid. Respondent testified that "[s]ometimes we have the [insurance check when the client signs off on the disbursement sheet], sometimes we don't."

[12] Respondent explained in her testimony to the Hearing Committee that the existence of a disbursement sheet did not always mean that there had been a settlement. Sometimes, respondent explained, she would propose a settlement to the client and only thereafter receive a final offer from the insurance company. Respondent testified that the date the client signed the "disbursement sheet" was not "[t]he full and final settlement date." The Hearing Committee did not discredit any of this testimony.

settlement funds in her escrow account within three or four days after August 1, 2012[.]" Further, it is not true that "*[u]ntil the post-hearing briefs*, [r]espondent never raised any doubt about when she actually received the money she was required to hold in trust for her clients' medical providers." *Post* at 27. Respondent testified, for example, that there were cases in which "the settlement check was not in our office" because "we hadn't even finished negotiating." We do not at all suggest that the Hearing Committee and the Board were required to credit respondent's testimony in that regard or to credit her testimony distinguishing client disbursement sheets from releases, but they (and we) were not entitled to misstate her testimony; and, having heard respondent's testimony that a signed client disbursement sheet did not necessarily mean that payment by the insurance company had been made or was imminent, and that in some cases insurance checks had not been received by the putative out-of-trust dates even though the client disbursement sheet had been signed, Disciplinary Counsel was on notice that it needed to prove that respondent had actually received the funds Disciplinary Counsel alleged should have been in her escrow account of the out-of-trust dates.

Disciplinary Counsel had the burden of proving misappropriation by clear and convincing evidence. *See, e.g.*, *In re Gilchrist*, 488 A.2d 1354, 1357 (D.C. 1985). This stringent standard "expresses a preference for the attorney's interests by allocating more of the risk" of an erroneous conclusion to Disciplinary Counsel. *In re Allen*, 27 A.3d 1178, 1184 (D.C. 2011) (internal quotation marks and brackets omitted). Clear and convincing evidence is "evidence that will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re Cater*, 887 A.2d 1, 24 (D.C. 2005) (quoting *In re Dortch*, 860 A.2d 346, 358 (D.C. 2004)).

As already described, here, Disciplinary Counsel attempted to prove misappropriation by showing that by August 1, 2012, respondent owed the medical providers an aggregate of $41,893 for nineteen selected cases, but, on the dates of October 5–8 and October 16, 2012, had a balance in her trust account of no more than $36,780 even though she had not yet paid the providers. The amounts that Disciplinary Counsel asserted, and the Board found, should have been in respondent's trust account on those dates are shown on a table on page 37 of the Board's Report, which also contains the names of the clients for whom chiropractic services had been provided. The Board found that by the putative out-of-trust

dates, respondent had received checks from insurance companies to pay the amounts shown on the table and had deposited the checks in her escrow account. For the reasons discussed below, we conclude that the Board's finding is not supported by clear and convincing evidence.

We have focused our analysis on the clients listed on page 37 of the Board's report (all MSS patients) who, the Hearing Committee found, signed client disbursement sheets in 2012 prior to the October out-of-trust dates and on whose behalf respondent had not paid MSS by those dates. As to clients Tiffany Quarles, K'Vonté Petty, Barbara Brown, Bernadine Ramsey, Ishara Cormack, Leroy Stroy, and Dajuan Gant, the record contains evidence that they received their settlement disbursements by sometime in August 2012. Specifically, the record contains either their signed receipts verifying their receipt of a settlement check, or notations by an MSS investigator memorializing the client's (or a relative's) confirmation that the client received a settlement check by August 22, 2012 (or, in the case of Stroy, a notation about a "[d]isbursement received on July 19, 2012").

By contrast, as the Hearing Committee found, the record "does not identify" when clients Latia Proctor, DeAngelo Wooten, and Ayonia Allen received their

settlement checks. The table on page 37 of the Board's Report indicates that respondent owed chiropractors $2,400 as to Ms. Proctor, $2,400 as to Mr. Wooten, and $1,000 as to Ms. Allen. The record also shows that Ms. Proctor and Mr. Wooten's telephone numbers were either "disconnected" or the "wrong number," that Ms. Allen did not return telephone calls, and that an MSS investigator working on August 22, 2012, was unable to reach these clients (and thus was unable to verify, as the investigator did with some other clients, that they had received their checks by that date).

Further, there is no record basis for the Board's finding that respondent "received the $7,000 settlement payment for [Ms. Proctor's] claim on June 13, 2012, when the client . . . signed a disbursement sheet"; no record basis for the Board's statement that respondent "received a settlement payment of $6,800 [for Mr. Wooten's claim] on June 19, 2012[,]" when Mr. Wooten signed a disbursement sheet; and no record basis for the Board's statement that "[r]espondent received $16,500 in settlement funds on July 3, 2012 [for Ms. Allen's claim]."

In addition, the record provides a basis to question whether respondent received funds relating to these three clients by the putative out-of-trust dates. The Hearing Committee heard evidence showing that in November 2012, Erik Tyrone, an attorney for two of the chiropractors who provided services to respondent's clients through MSS, "signed a number of documents authorizing . . . reduction[s] in the [provider's] bill[s]" for Ms. Proctor, Mr. Wooten, and Ms. Allen (and some other clients). Respondent explained — in testimony that the Hearing Committee did not discredit — that "[i]n most cases [in which Mr. Tyrone signed off on reductions] we hadn't even finished negotiating . . . . So, no, the settlement check was not in our office" (with the result that respondent "couldn't pay [herself] either").[13] If, by the putative out-of-trust dates, respondent had not yet received from the insurance companies the total of $5,800 owed to the medical providers for services provided to Ms. Proctor, Mr. Wooten, and Ms. Allen, that would eliminate the putative out-of-trust amounts of $5,113 and $5,210.

---

[13] Respondent further testified, "[T]here were cases that were not settled, that we could not settle, until we had these reductions signed by Mr. Tyrone." Whether or not respondent was correct that this was the circumstance in most cases, the record does indicate that some of the clients (specifically, Brown, Cormack, and Gant) as to whom Mr. Tyrone authorized billing reductions in November 2012 had been paid their settlement amounts well before that date.

We note in addition that, regarding both the Proctor and Wooten cases, the Hearing Committee found that the record "does not identify the amount of the reduction[s]" to which MSS had agreed. (The Proctor and Wooten cases are the only cases among the 19 selected cases as to which the Hearing Committee made such a finding.) Thus, the record does not indicate whether MSS and respondent had agreed on the reduction amounts shown on the client disbursement sheets these clients signed, and it leaves open the possibility that post-signed-disbursement-sheet negotiations with MSS continued or were necessary to achieve a final settlement agreed to by all. What the record does show is that it was not until November 2012 that MSS corrected an administrative error that that had caused the MSS bill for X-rays for Ms. Proctor and Mr. Wooten to be overstated. The November 26, 2012, billing adjustment forms that Mr. Tyrone signed state that "Client disputes X-ray bill" and in Mr. Wooten's case state that "X-Ray report was never sent to attorney despite several requests." Further, regarding the Proctor case, the record shows that Mr. Tyrone purported to reinstate an MSS reduction that had been "rescinded before [the] client signed [a] release."[14] These items of

---

[14] The record does not support the Hearing Committee's statement that respondent "false[ly]" asserted that MSS had rescinded the reduction before Ms. Proctor signed the release. The Hearing Committee was apparently comparing the date when Ms. Proctor signed a client disbursement sheet (June 13, 2012) — not a

evidence suggest that the Proctor and Wooten cases may have been among the cases that respondent had been unable to fully settle before November 2012. For that reason, the record does not establish clearly and convincingly that, on or before the putative out-of-trust dates, respondent received checks from insurers with which to pay the amounts (totaling $4,800) owed to MSS for services to these clients.

The Allen case is also one as to which Mr. Tyrone, in November 2012, made a billing adjustment reinstating a reduction to which MSS had agreed months earlier. In addition, the disbursement sheet for Ms. Allen shows that her agreed-to settlement was conditioned on a reduction of a bill from "Slade Healthcare Inc." (a reduction from $4,470 to $2,200). The record does not show whether that provider had already agreed to the reduction or whether it was still a subject of negotiation at the time Ms. Allen signed the disbursement sheet on July 3, 2012, or even by the October out-of-trust dates. Accordingly, the evidence is less than clear and convincing that the $1,000 owed to MSS on behalf of Allen had been received by respondent from the insurance company before the October out-of-trust dates.

_____
(…continued)
release — and the later date when MSS withdrew its reduction (September 21, 2012).

For all the foregoing reasons, and especially in light of the deficient proof that by the putative out-of-trust dates respondent had actually received the total of $5,800 owed to the chiropractors for services provided to Ms. Proctor, Mr. Wooten, and Ms. Allen, there is not clear and convincing evidence to support the Hearing Committee's and Board's finding that respondent's trust account was out-of-trust (by $5,113 and $5,210, respectively) on the dates in question.[15]  We cannot say that there was no misappropriation, but we are satisfied that misappropriation was not clearly and convincingly proven.  We therefore conclude that a finding of misappropriation is not warranted.

**IV.**

---

[15]  Our dissenting colleague criticizes our having "carve[d] out the[se] three questioned matters[.]"  *Post* at 29.  But, again, these three matters are the only ones for which there is no record evidence of when the clients were paid (or when respondent received a check from the insurance company).  Is it merely a coincidence that if one removes (from the "owed to providers" column) the amounts owed to MSS for these three clients, the result is that respondent's trust account held sufficient funds to pay the amounts owed to providers on the putative out-of-trust dates?

Having found that respondent committed intentional misappropriation, the Board did not recommend a sanction for the Rule 1.15 violations relating to untimely payment to third parties. Having found the Rule 1.15 (a), (c) and (d) violations as well as negligent misappropriation, the Hearing Committee recommended a sanction of a one-year suspension without a fitness requirement,[16] and possibly a practice monitor or referral to the D.C. Bar's Practice Management Advisory Service to assist respondent in handling entrusted funds "in compliance with her ethical and fiduciary obligations." Asked during oral argument before the Board what the sanction should be if the Board did not find misappropriation, Disciplinary Counsel stated that a six-month to one-year suspension would be appropriate.

Ordinarily, we would remand to the Board for its recommendation regarding a sanction for the Rule 1.15 violations relating to untimely payment to third parties. However, the Board found 34 separate violations with respect to timely paying the medical providers, and we conclude that this warrants a sanction at the higher rather than lower end of the range that both the Hearing Committee and

---

[16] The Hearing Committee opined that there is not a serious doubt as to respondent's fitness to practice law.

Disciplinary Counsel recommended to the Board. We therefore have determined to impose on respondent the sanction of a one-year suspension, effective from the date on which she filed (or, if necessary, hereafter files) the affidavit required by D.C. Bar Rule XI, § 14 (g).

*So ordered.*

FARRELL, *Senior Judge*, dissenting. My colleagues have changed their mind and, by focusing on three of the nearly nineteen client matters relied on by the Hearing Committee and the Board on Professional Responsibility, now conclude that Disciplinary Counsel failed to prove by clear and convincing evidence that respondent misappropriated funds received from medical insurers that either should have been paid to medical providers on receipt or held in trust pending resolution of disputes with the provider. Respondent's dealings with one provider, MSS, are chiefly at issue, but the Hearing Committee found that, as to a second provider as well, Dr. Yousefi, respondent misused funds (in part for personal litigation expenses) and at the evidentiary hearing "duplicitous[ly] characteriz[ed]"

her behavior in failing to keep the funds in trust.[1] I dissent for the reasons stated in our previously issued opinion for the court, reported at 180 A.3d 86 (D.C. 2018).

"A central issue," the majority recognizes, is when respondent actually received settlement checks from the insurance companies, thereby triggering her duty either to pay the provider or to deposit and hold disputed funds in trust. In now deciding favorably for respondent, the majority first dismisses the Board's key reliance on respondent's own "'repeated[]'" and "'insistent[] urg[ing]'" before the Hearing Committee "'that all settlement funds at issue . . . were timely deposited in her trust fund'" contemporaneously with their receipt well before the twin October out-of-trust dates. *Id.* at 88 (quoting Board). Its two reasons for disregarding that admission are far-fetched. First, respondent's multiple concessions that she received settlement checks "on or about" specified dates before October carry no weight for the majority because, in *criminal* procedure, an indictment charging a crime "on or about" puts a defendant on notice "that a particular date is not critical." *Ante* at 11 (citing criminal case authority for

---

[1] Unlike my colleagues, the Hearing Committee had no doubt that respondent misused funds owed Dr. Yousefi, as well as MSS, by exploiting "further delay of payment to resolve all outstanding matters" and "threats and bullying to clear her files of overdue payments."

absence of "prejudicial variance" when dates of indictment and proof may vary as much as five months). So respondent, we are asked to believe, could have had in mind the usage in criminal charging documents when acknowledging her receipt of payments, rather than the meaning "on or about" conveys to an ordinary hearer. *See On or About*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("on or about" means "[a]proximately; *at or around the time specified*") (emphasis added). Second, the majority says that Disciplinary Counsel's reliance on the "account balance methodology" at the hearing surprised respondent such that she had no reason to know in pleading "that more precision in her answers about dates" was required. *Ante* at 10. But, as Disciplinary Counsel points out, "*[u]ntil the post-hearing briefs*, [r]espondent never raised any doubt about when she actually received the money she was required to hold in trust for her clients' medical providers." And, as an experienced member of the bar, respondent surely knew that lack of "precision" in her admissions would not justify a delay of months between receipt of entrusted funds and their payment to the provider or deposit in escrow.

In sum, the Board and the Hearing Committee could properly conclude that respondent, in repeatedly admitting close contemporaneity between the clients' signing of settlement sheets and her receipt and deposit of insurance payments, was

neither misled in her answers nor mentally reserving a (quasi-criminal) defense of receipt of payments much later than she acknowledged.

The majority goes on to concede that, as to the bulk of MSS cases relied on by Disciplinary Counsel, the record shows that the patients "received their settlement disbursements by sometime in August 2012," *ante* at 18, long before the October out-of-trust dates. But the majority then focuses on the insurance payments received in the three matters of MSS patients Proctor, Wooten, and Allen, where it says the record "provides a basis to question whether respondent received funds relating to these three clients by the putative out-of-trust dates." *Ante* at 20. Our original opinion, however, cited ample reason in the record for the Hearing Committee and the Board to conclude that those three cases, like nearly all others in the nineteen charged client matters, followed this pattern: "[T]he medical provider would agree to reductions reflected on the [patient] disbursement sheets, then withdraw those reductions after respondent, though paid by the insurers, failed to pay the bills (often claiming 'fraudulent' billing), whereupon either the provider would reinstate the reductions after further negotiations or the patients would be saddled with paying the balance." 180 A.3d at 89.

I am unpersuaded by the court's effort to carve out the three questioned matters from this pattern of misappropriation shown by the fully nineteen cases relied on by Disciplinary Counsel. There is, for one thing, no evidence that when MSS (having reduced its bills) pressed respondent for payment in the Proctor, Wooten, and Allen cases, respondent answered by claiming she had not received payment from the insurers. Her replies instead asserted the alleged inaccuracy of the bills, as when she told MSS's Director Moise that "it's not about the reductions. It's about these clients now alleging . . . that they did not have these types of treatments. How are you going to take care of that?" The Hearing Committee found it critical that, in the Proctor, Wooten, and Allen cases, "as with all of these matters, there is no evidence that any insurer or any other third party challenged the accuracy or validity of the charges on MSS's bills." The likelihood, therefore, that payment by the insurers had been delayed because respondent was "unable to fully settle" these cases with MSS until November, *ante* at 22, must surely approach zero.

The majority repeatedly appears to credit respondent's hearing testimony, or to reject the Hearing Committee's decision to discredit it, or conversely to rely on the Committee's not having expressly discredited parts of it the majority thinks

telling – all related to respondent's insistence that she was still negotiating matters well after the October dates. But, like the Board, I find ample reason in the record for the Hearing Committee to find appellant's often-confused testimony about her ongoing negotiation and delay in receiving insurance funds unreliable.[2] Citing her testimony, for example, the Hearing Committee found that "[r]espondent's efforts to excuse the excessive delay in paying Ms. Proctor's medical providers [or else her failure to hold the funds in trust were] exceptionally egregious," including respondent's "false" testimonial assertion about when MSS had reduced Proctor's bills and her admitted use of an attorney, Eric Tyrone (engaged personally by two MSS doctors), to effect reductions of which MSS, through Director Moise, was not informed at the time. Mr. Tyrone, as the Hearing Committee found, "was counsel for the chiropractors and not MSS," and thus respondent's "practice of using [him] to cover her failings demonstrates an appalling callousness towards the duty she owed the doctors." Likewise, respondent's arguments as to her delayed payment to MSS in the Allen matter "f[e]ll flat," the Hearing Committee found, mainly for

---

[2]    The majority's proper insistence that the Board and the Hearing Committee "were not entitled to misstate respondent's testimony," *ante* at 16, largely confuses misstatement with what both bodies actually did, which was to reject as untrustworthy respondent's explanations for having neither paid over funds received from insurers nor deposited them in escrow.

the reason already stated: "there is no evidence that any insurer . . . challenged the accuracy or validity of the charges on MSS's bills."

Altogether, as the Hearing Committee found, respondent simply "used further delay of payment as leverage": although the insurers had "paid settlements . . . without reserving any right to challenge the integrity of medical bills," respondent "was able to bully or scare MSS into agreeing to some further reductions that inured to the benefit of a few of her clients" – a "windfall for some clients" resulting from "the derogation of her duties to the medical providers" and the accompanying risk of lawsuits by MSS against other clients. These findings, echoing the Committee's finding of "duplicitousness" in her dealings with Dr. Yousefi and testimony about them, are not clearly erroneous. The unanimous Board therefore had sound reason to conclude, that as to the Proctor, Wooten, and Allen matters, like most others, "[r]espondent's attempted justification of her tardy payments to MSS relies essentially on her own testimony, *which the Hearing Committee rejected*" (italics added), and that, in her testimony, respondent "proffered utterly meritless excuses for her failures promptly to pay her clients' medical providers" or alternatively hold the received funds in trust. Respondent's repeated shortfalls in her trust account were not severe, but Disciplinary Counsel,

aided by respondent's unconvincing explanations, *see In re Thompson*, 579 A.2d

218, 221 (D.C. 1990), proved them by clear and convincing evidence.