Randolph O. WILLIAMS, Appellant,

v.

UNITED STATES, Appellee.

No. 99–CF–319.

District of Columbia Court of Appeals.

Argued May 11, 2000.

Decided June 15, 2000.

Frederick J. Sullivan, Bowie, MD, appointed by the court, for appellant.

Mary–Patrice Brown, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher and Thomas J. Tourish, Jr., Assistant United States Attorneys, were on the brief, for appellee.

Before REID, GLICKMAN, and WASHINGTON, Associate Judges.

WASHINGTON, Associate Judge:

Appellant Randolph O. Williams was charged with five counts of first-degree child sexual abuse, in violation of D.C.Code § 22–4108 (1995 Supp.). The prosecutor dismissed count three of the indictment at the close of its case, and the trial court granted a motion for judgment of acquittal on count two of the indictment. Williams was convicted by a jury of two counts of first-degree child sexual abuse, as alleged in counts one and five of the indictment, but was acquitted on count four of the indictment. Williams filed a timely notice of appeal. On appeal, Williams argues that (1) the trial court erred by admitting into evidence the complainant's statements to her friend under the "report of rape" exception to the hearsay rule; and (2) his conviction on the fifth count of the indictment should be reversed because it was not supported by ample evidence and the evidence supporting this count presented a variance from or constructive amendment of the indictment. We affirm.

## I.

### A. *The Government's Evidence*

On a Saturday in August 1997, Williams, then thirty-five years old, called the house of the complaining witness in this case, M.D., a fourteen-year-old girl. Williams had been an acquaintance of M.D.'s family since she was one-year old. On that Saturday, Williams asked M.D.'s mother, Valerie, if he could watch a cable movie at her house. Valerie agreed, and she, her three children, and Williams watched the movie in the living room. During the movie, Valerie decided to go to the grocery store. Williams offered to pick her up from the store after the movie. Valerie agreed, leaving her three children at home with Williams.

After Valerie left, M.D.'s older brother left to play tennis. M.D.'s younger sister fell asleep on the living room sofa. Williams and M.D. went to the basement to play video games. M.D. then removed all of her clothes, and Williams removed only his pants. Williams put on a condom and engaged in sexual intercourse with M.D. on the floor of the basement. After intercourse, Williams removed the condom, put it in the basement toilet, and flushed the toilet. Williams and M.D. then returned upstairs where her sister was still asleep on the sofa. Soon afterwards, Valerie called to say that she was finished at the grocery store. She spoke to M.D. but detected nothing wrong.

Williams picked Valerie up at the grocery store and brought her home. He left after he helped Valerie bring the groceries into the house. After M.D. helped Valerie put the groceries away, Valerie went downstairs to the basement to put some clothes in the dryer. She noticed that the toilet seat was up,[1] and then she saw a condom in the toilet.[2] Valerie became

---

1. It was unusual for the seat to be up, because Valerie's son usually put it down.

2. The toilet flushed fully only if the handle was held down.

very nervous. She picked the condom out of the toilet, shook the water out, and looked to see if anything was on it. Valerie knew that Williams had been the only man in the house and wondered whether he had engaged in sex with M.D. Valerie flushed the condom down the toilet and then went upstairs to talk to M.D. Valerie asked M.D. where the condom in the basement toilet came from, but M.D. just stared. Valerie repeated her question, and M.D. continued to stare. Valerie repeated her question again, and M.D. told her to ask Williams. Valerie asked M.D. if Williams had hurt her, but M.D. just stared. Valerie then examined M.D.'s genitals, wondering if she had been hurt or torn.[3]

M.D. saw Williams about one month after the August incident, when she went to his apartment for the first time. M.D. did not remember if she had sex with him during this visit. However, M.D. did remember having sex with Williams in his apartment on a school day after the August incident. She recalled that Williams used a condom that he had retrieved from his hallway closet. M.D. did not specify a date for this sexual encounter. About two months after the first sexual encounter at Williams' apartment, M.D. recalled having sex with him on his carpeted living room floor. M.D. believed that this incident "maybe" happened after December 23, 1997. M.D. also recalled a third occasion when she had sex with Williams in his apartment. She and Williams had sex in his bed, under the covers. Although M.D. could not recall the month, she testified that it was after Christmas. M.D. testified about one additional incident of sexual intercourse with Williams at his apartment.[4] This event occurred about two weeks before an encounter she had with an old neighbor, Delores Vanderhall. During this encounter, M.D. recalled that on a school day in February, she went to visit Williams. It was exam time, so there was only half a day of school. M.D. saw Vanderhall in her car as she walked into Williams' apartment. M.D. did not have sex with Williams on this occasion. Vanderhall called Valerie that day to report where she had seen M.D. Valerie took M.D. to the police station for a second time.

On two occasions, M.D. reported to her best friend, Jacquia Warren, that she was having sex with Williams. M.D. would also sleep over at the Warrens' house about every other weekend. During these sleepovers, M.D. would speak with Williams on the phone. Dr. Kim Kelly, a local pediatrician, testified that she saw M.D. during a sick visit on December 23, 1997. During this medical visit, M.D. asked Dr. Kelly for an HIV test. When Dr. Kelly asked M.D. why she wanted this test, she replied that she had started having sex. M.D. also told Dr. Kelly that she was having sex, using condoms, every one to three weeks with a thirty-year old male who had two children.[5]

### B. The Defense Evidence

Williams, testifying on his own behalf, stated that on August 16, 1997, he and Valerie "had a big fallout" about a condom that was found in her toilet. Valerie paged Williams and said she needed him to take her to the grocery store and back. Williams planned to meet some friends

---

3. Valerie took M.D. to the police station about one week after this incident. M.D. testified that a police detective confronted her about having sex with Williams, but she denied that it had happened. M.D. testified that the police threatened to put her in a home if she did not tell them she was having sex with Williams.

4. Valerie recalled a weekday in February when M.D. had left a note at home indicating she had gone to a shopping mall. She thought the date was probably the beginning of the week or the beginning of the end of the month. When M.D. returned home, she did not have any shopping bags or money. Valerie saw "hickeys" on the left side of M.D.'s neck.

5. Williams told Valerie that he had two small children.

that evening for a movie and billiards, so he said he would take Valerie to the store but could not wait for her there. Williams claims that he dropped Valerie at the store and did not see her anymore that night. According to Williams, he was working at his father's grocery store the next day when M.D. came into the store and told him that Valerie had found a condom in the toilet. M.D. said that she was scared her mother would punish her and send her away if she found out that she had been having sex with a boy in the house. M.D. told Williams that she had told Valerie that she had been having sex in the house with him. Williams asked M.D. if she knew how much trouble he could get into, and M.D. started crying. Williams testified that he was upset and continuously called Valerie until she got home.

When Williams spoke with Valerie, she told him that M.D. said the condom was his and that he had been having sex with her. He told Valerie that M.D. had said the condom belonged to someone else. Valerie called Williams the next day and told him, "Your ass will pay." Williams testified that he told Valerie that he wanted to break all ties with her and her children because he did not want to get caught up in something he did not do. According to Williams, Valerie continuously harassed him so that he had to change all his numbers. In September 1997, the police called Williams, and he voluntarily spoke to them.

In October 1997, Williams' recording career was "getting vigorous," and he claimed that he did not see Valerie or M.D. during October and November because he was spending so much time in the studio. He went to New York on December 31, 1997, because some friends wanted his input on a production. Williams remained in New York until March 12, 1998, and was never in Washington, D.C. during that time period. He was arrested on March 12, 1998, when he returned to the area. Williams claimed that the apartment in which M.D. alleged to have had sexual intercourse with him on several occasions belonged to his brother. He testified that his fiancé, LaTanya Lynch, may have been to that apartment a couple of times.

## C. *The Government's Rebuttal Evidence*

The government called LaTanya Lynch as a rebuttal witness. Ms. Lynch testified that she was not Williams' fiancé, as he had alleged, because she had stopped seeing him in November 1997. The last time Lynch had been to the apartment that Williams claimed belonged to his brother was November 2, 1997. Williams told Lynch that the apartment was his. She further testified that he kept his condoms in a hallway closet of the apartment, outside the bedroom.

## II.

Williams contends that the trial court erred by admitting into evidence M.D.'s statements to her friend, Jacquia Warren, that she was having sex with Williams. Williams specifically argues that the trial court erred in permitting the introduction of these statements under the "report of rape rule" because the sexual offense in this case was consensual and nonoffensive to M.D. Under the report of rape rule, "a witness may testify that the complainant stated that a sexual crime occurred and may relate the detail necessary to identify the crime." *Galindo v. United States*, 630 A.2d 202, 209 (D.C.1993). Although the corroboration requirement has been abolished as a part of the government's burden of proof, we have recognized that the need for corroboration continues to exist and that the report of rape rule remains valid. *Id.* This court in *Battle v. United States*, 630 A.2d 211, 217 (D.C.1993) (citations omitted), identified three separate rationales for the report of rape rule:

First, evidence of a complaint of rape negates jurors' assumptions that if there is no evidence of a complaint, no complaint was made. Second, such evidence negates prejudices held by some jurors

by showing that the victim behaved as society traditionally has expected sexual assault victims to act, i.e., by promptly telling someone of the crime. Third, such evidence rebuts an implied charge of recent fabrication, which springs from some jurors' assumptions that sexual offense victims are generally lying and that the victim's failure to report the crime promptly is inconsistent with the victim's current statement that the assault occurred.

Williams' contention that these rationales for admission of reports of rape do not apply in this case because M.D. was a willing participant in the sexual relationship with him is without merit. While it is true that M.D. may have been a willing participant, when an age gap like the one in this case exists, the minor cannot consent to sexual intercourse in a meaningful way. *See Ballard v. United States*, 430 A.2d 483, 486 (D.C.1981) (former statutory proscription against carnal knowledge intended to protect females below age of sixteen, regardless of use of force or consent, from any sexual relationship). The admission of M.D.'s statements to Warren is consistent with the third rationale of the rape report rule of rebutting an implied charge of recent fabrication. Williams' defense at trial was that M.D. falsely implicated Williams because she did not want her mother to find out that she was having sex with teenage boys. During the cross-examination of M.D., Williams attempted to show that M.D. had fabricated the charges against him out of fear of being sent to a home. This intent to imply fabrication is clear in Williams' closing argument, when he stated that M.D. had a

motive to lie because she did not want to tell her mother, the police, and her pediatrician that she was sexually active with her peers. However, M.D.'s disclosures to Warren occurred in a non-coercive environment. The exclusion of these statements to Warren would have misled the jury into believing that M.D. implicated Williams only when she was questioned by an authority figure and felt pressure to lie to protect herself. In light of the concern expressed in *Battle* that jurors assume that sexual offense victims are generally lying, we cannot accept Williams' view that exclusion of M.D.'s statements to Warren would not have prejudiced the jury against her. Furthermore, the trial court instructed the jury that M.D.'s statements may be considered in judging her credibility as a witness, but not as proof that what she said happened in the statement was true.[6] There is no evidence that the jury misunderstood or did not follow the trial court's instructions.

Even if M.D.'s statements to Warren did not fall under the report of rape rule, they would be admissible as substantive evidence under the prior identification exception to the hearsay rule. "Evidence that the complainant had stated that appellant was the person who sexually assaulted her was admissible under the prior identification or prior description exception to the hearsay rule." *Battle*, 630 A.2d at 215. *See Warren v. United States*, 436 A.2d 821, 837 (D.C.1981) (victims' suppression hearing testimony and police testimony recounting victims' statements were admissible under prior description testimony exception to hearsay rule insofar as they consisted "solely of descrip-

---

6. Williams also argues that the prosecutor's closing argument, which suggested to the jury that M.D.'s statements to Warren "corroborated" her testimony, was willful and improper. Williams appears to be contending that the prosecutor's use of the word "corroborate" led the jury to consider M.D.'s statements to Warren as substantive evidence that Williams committed the crimes with which he was charged. However, Williams raised no objection to the prosecutor's closing argu-

ment. Furthermore, use of the term "corroborate" does not imply that the content of M.D.'s statements to Warren was admissible for its truth, but simply implies that such disclosure to Warren tends to support M.D.'s testimony concerning Williams' crimes. *See Barrera v. United States*, 599 A.2d 1119, 1125 (D.C.1991). Therefore, we cannot conclude that the prosecutor's use of the word "corroborate" was willful and improper.

tions or identifications of the complaining witness' assailants") (citing *Morris v. United States*, 398 A.2d 333 (D.C.1978)); *see also Yelverton v. United States*, 606 A.2d 181, 184 & n. 8 (D.C.1992) (citing *Clemons v. United States*, 133 U.S.App. D.C. 27, 408 F.2d 1230 (1968), *cert. denied*, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969); *Sherrod v. United States*, 478 A.2d 644, 660 (D.C.1984)).[7] However, "testimony recounting details of the complainant's descriptions of the offense would not be admissible under the prior identification exception." *Battle*, 630 A.2d at 215. M.D.'s admissions to Warren fall under the prior identification exception to the hearsay rule because her statements identified Williams as the person she was having sex with but included no details of the sexual incidents. Therefore, the trial court did not err in admitting M.D.'s statements to Warren that she was having sex with Williams.

■■■ Williams also contends that his conviction on the fifth count of the indictment should be reversed because it was not supported by ample evidence. Williams specifically argues that counts four and five of the indictment were factually identical, and M.D. did not have a specific memory of when the acts alleged in those counts had occurred. In other words, the event M.D. described as happening two weeks before she encountered Vanderhall in February 1998 could have been the same event that she described as happening "after Christmas." Therefore, the trial court erred in allowing counts four and five to go to the jury on the theory that the government's evidence of two distinct acts was sufficiently compelling. We will reverse a conviction for insufficient evidence only if there is no evidence from which a reasonable mind might find the defendant guilty beyond a reasonable doubt. *Jones v. United States*, 716 A.2d 160, 162 (D.C.1998). "When review-

ing a challenge to sufficiency of the evidence, we examine the evidence in the light most favorable to sustaining the verdict." *Id.* We must recognize "the jury's province to weigh the evidence, determine the credibility of witnesses, and make justifiable inferences from the evidence." *Green v. United States*, 718 A.2d 1042, 1062 (D.C.), *cert. denied*, 526 U.S. 1011, 119 S.Ct. 1156, 143 L.Ed.2d 222 (1999). This court must also accord equal weight to circumstantial evidence and direct evidence. *Hammon v. United States*, 695 A.2d 97, 107 (D.C.1997).

M.D.'s testimony was sufficient to establish the essential elements of first-degree child sexual abuse as charged in count five of the indictment. After describing the first four occasions on which she had sexual intercourse with Williams, the prosecutor directed M.D.'s attention to her encounter with Vanderhall in February. M.D. testified that she saw Vanderhall on a school day in February 1998, when she was going to Williams' house. She further pinpointed the date of this encounter with Vanderhall by recalling that it was exam time, so she only had a half-day of school. M.D. also testified that she had sexual intercourse with Williams probably two weeks before she saw Vanderhall. She testified that this sexual encounter occurred on a school day, in Williams' bedroom, and that they both removed all of their clothes. The trial court also correctly found that M.D. described the sexual encounters covered by counts four and five of the indictment as separate and distinct acts. The trial court based its finding on its judgment that M.D. described the incident in February "as a separate incident from the time in the bedroom under the covers" and that "[t]here wasn't any reason to think she was repeating the same instance."

---

7. D.C.Code § 14–102(b)(3) (1999 Supp.) provides that "[a] statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the

statement and the statement is ... an identification of a person made after perceiving the person. Such prior statements are substantive evidence."

Furthermore, M.D.'s testimony concerning count five of the indictment, the incident of sexual intercourse with Williams that occurred in February, was corroborated by independent testimony which the jury could have considered in its decision that count five, and not count four, of the indictment was supported by proof of guilt beyond a reasonable doubt. Valerie testified that on a weekday in February 1998, a day that she distinguished from the day during exam week when she received the telephone call from Vanderhall, M.D. was not at home when she returned from work. Valerie testified that M.D. had left a note that she was at a shopping mall. According to Valerie, this note was unusual because M.D. had not asked for permission to go to the mall, and she did not have any money. When M.D. returned home, she did not have any shopping bags or money. Valerie further testified that during dinner she discovered M.D. had hickeys on the left side of her neck. Because this testimony provides sufficient circumstantial evidence that supports the jury's verdict of guilty on count five of the indictment, we conclude that there was ample evidence to support Williams' conviction on count five of the indictment.

▬▬ Williams finally contends that the evidence supporting the fifth count of the indictment presented a variance from or constructive amendment of the indictment. Williams' claim is based on the difficulty the trial court had in determining what evidence pertained to what specific count, the lack of clarification as to what facts form the basis of the grand jury charges, and that the government failed to prove specific sexual acts at trial. Rule 7(c) of the Superior Court Rules of Criminal Procedure requires that the indictment shall contain "a plain, concise and definite written statement of the essential facts constituting the crime charged." This "eschews emphasis on technical requirements and deficiencies, casting some of the burden on a defendant to pursue additional details, if needed, by way of a bill of particulars." *Hsu v. United States,* 392 A.2d 972, 977 (D.C.1978). The indictment serves two chief purposes "first to apprise the accused of the charges against him, so that he may adequately prepare his defense, and second to describe the crime with which he is charged with sufficient specificity to enable him to protect against future jeopardy for the same offense." *Gaither v. United States,* 134 U.S.App. D.C. 154, 159, 413 F.2d 1061, 1066 (1969); *see Meredith v. United States,* 343 A.2d 317, 319 (D.C.1975) (citations omitted).

▬▬ A literal amendment occurs "when the trial court strikes a specific, relevant allegation the grand jury charged—an allegation necessary to prove the offense—so that the defendant can be convicted without proof of that allegation." *Ingram v. United States,* 592 A.2d 992, 1005 (D.C.1991). A constructive amendment occurs when "the trial court permits the jury to consider, under the indictment an element of the charge that differs from the specific words of the indictment." *Id.* Therefore, in evaluating whether the indictment has been amended, this court compares the evidence and the judge's instruction to the jury with the charge specified in the indictment. *Id.* Where an objection has been made below, a constructive amendment is reversible error. *Id.* A variance, on the other hand, occurs when "the facts proved at trial materially differ from the facts contained in the indictment 'but the essential elements of the offense are the same.'" *Id.* at 1006 (quoting *United States v. Keller,* 916 F.2d 628, 634 (11th Cir.1990)). A variance will not warrant dismissal except upon a showing of prejudice. *Scutchings v. United States,* 509 A.2d 634, 637 (D.C.1986). Prejudice is normally considered to be present "if there is danger [that] the accused will be prosecuted a second time for the same offense, or that he was so surprised by the proof that he was unable to prepare his defense adequately." *Roberts v. United States,* 743 A.2d 212, 223 (D.C.1999) (quoting *United States v. Francisco,* 575 F.2d 815,

818 (10th Cir.1978)). A defendant's failure to ask for a continuance may defeat a claim of surprise. *Id.*

■ Williams argues that the government proved a routine of sexual offenses that were nonspecific as to date or activity which constructively amended count five of the indictment because it broadened its terms. Williams also argues that variance occurred because the government failed to prove specific acts. However, Williams fails to specify how the indictment was altered through the government's trial evidence. Count five of the indictment simply charged that, on or about the month of February 1998, Williams engaged in sexual intercourse with M.D. The indictment did not particularize any other specific facts of the incident. This is precisely the conduct of which Williams was convicted. *See Pace v. United States,* 705 A.2d 673, 676 (D.C.1998). When an indictment charges that an offense occurred "on or about" a date or range of dates, the "evidence will conform to the indictment in such circumstances if it establishes that the offense was committed on a date reasonably close to the one alleged." *Ingram,* 592 A.2d at 1007. As previously stated, the evidence at trial was that the sexual encounter covered by the fifth count of the indictment occurred approximately two weeks before M.D. encountered Vanderhall in February. The actual date of the offense varied from the charged date by no more than approximately two weeks and was therefore "reasonably close." *See Pace,* 705 A.2d at 677–78 (no prejudicial variance when indictment charged offense occurred on or about the month of April, and evidence at trial established that offenses occurred during five-month period between late December and late May). Furthermore, Williams cannot show any divergence between his indictment and the evidence and jury instruction at trial.

■ Williams appears to really be arguing that he was prejudiced by the generality of the language in the indictment. However, Williams could have objected to the indictment or request a bill of particulars, both of which he failed to do. *See Bush v. United States,* 215 A.2d 853, 855 (D.C.1966). Williams' additional claim that his double jeopardy guarantee was compromised is also without merit. There is no prejudice to Williams because "[i]t can hardly be doubted that [Williams] would be fully protected from again being put in jeopardy for the same offense, particularly when it is remembered that [he] could rely [not only upon the indictment but also] upon other parts of the present record in the event that future proceedings should be taken against [him]." *Roberts,* 743 A.2d at 223 (quoting *Russell v. United States,* 369 U.S. 749, 764, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962)). Therefore, we conclude that the evidence supporting the fifth count of the indictment did not present a variance from or constructive amendment of the indictment.

*Affirmed.*