*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CF-88

GEORGE FRANCIS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-6915-14)

(Hon. Judith Bartnoff, Trial Judge)

(Argued February 20, 2020                     Decided August 12, 2021)

*Peter H. Meyers*, with whom *Joseph Virgilio* was on the brief, for appellant.

*Kathleen W. Gibbons*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, *Kenya Davis*, and *Marisa West*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and BECKWITH, *Associate Judges*, and FERREN, *Senior Judge*.

GLICKMAN, *Associate Judge*: Appellant George Francis challenges his convictions for contempt,[1] obstruction of justice,[2] and conspiracy to obstruct justice.[3] For the following reasons, we affirm.

**I.**

On the evening of February 19, 2014, seventeen-year-old A.M. called police and reported that an unknown man had assaulted and robbed her shortly after 6 p.m. in an alley off Georgia Avenue, N.W., while another man stood watch. Appellant and his friend Robert Turner were identified as suspects from video surveillance footage showing them near the alley at about 6:15 p.m.[4] In subsequent testimony before a grand jury, Mr. Turner admitted that he and appellant were at the alley and that appellant had attacked A.M. there. He also admitted to having participated in manufacturing a false alibi for appellant.

---

[1] D.C. Code § 11-944(a) (2012 Repl.).

[2] D.C. Code § 22-722(a)(6) (2012 Repl. & 2021 Supp.).

[3] D.C. Code §§ 22-1805(a), -722(a)(6) (2012 Repl. & 2021 Supp.).

[4] According to the detective who testified about the video footage at trial, it showed appellant and Turner getting off a bus at 6:03 p.m. and approaching the alley at about 6:13 p.m.

The grand jury eventually returned a six-count indictment against appellant. The first three counts charged him with crimes of violence against A.M., namely assault with intent to commit first degree sexual abuse, kidnapping, and robbery. The other three counts charged appellant with offenses committed after the assault on A.M., namely criminal contempt, obstruction of justice, and conspiracy to obstruct justice. At trial, the jury acquitted appellant of the robbery and hung on the assault and kidnapping charges. It found appellant guilty of contempt and the obstruction charges.

The charges of conviction allegedly arose from an overture to A.M. on appellant's behalf after he was arrested, in violation of a court "stay away" order, and the creation of a false alibi defense for appellant.

## A. Contact with A.M.

On April 19, 2014, at appellant's presentment hearing, the trial court granted the government's request for a stay away order. In bold and all-capital letters, the order required appellant "to have no contact" with A.M. "by any means whatsoever" and "not [to] communicate or even attempt to communicate" with A.M. "either directly or through any other person (except through your lawyer)." The order warned that any violation could result in appellant's prosecution for contempt of court, and other consequences. At some point, appellant signed the order. We say

"at some point," because the order was not dated (a point of contention in this appeal).[5]

On April 30, as A.M. testified at trial, a classmate of hers, Brice-Aime Tengen, approached her at school with a message from appellant. According to A.M., Mr. Tengen said appellant "just wants me to tell you that he's not guilty and he wants [you] to talk to his lawyer." A.M. refused to do so. Mr. Tengen testified that it was A.M., not he, who initiated the conversation, and he denied that appellant or anyone else had asked him to discuss appellant's case with her. But the government introduced an April 30 text-message conversation between appellant and Mr. Tengen that contradicted Mr. Tengen. In the conversation, appellant asked Mr. Tengen, "Aye [*sic*] you talked to that girl yet yung[?]" [*Sic*] Mr. Tengen responded, "What you want me to tell her?" Appellant answered, "Yea explain to her that they blaming the wrong person and ask if she can talk to my lawyer." Appellant then asked for "her first and last name" so he could be sure Mr. Tengen was talking to

---

[5] On April 19, appellant was detained pursuant to D.C. Code § 23-1322((b)(1)(A) (2012 Repl. & 2021 Supp.)). He was brought back to court and released on April 23. At that time, a magistrate judge reviewed the stay away order with appellant and verbally ordered him "not to have any contact or communication with" A.M. According to the transcript of the proceeding, the magistrate judge asked appellant if he understood these conditions, and appellant said, "Yes, ma'am." The jury was never informed of this information, however, even though Count 4 of the indictment alludes to it in charging appellant with contempt. See footnote 6 *infra*.

"the right person." Mr. Tengen replied with A.M.'s full name and reported to appellant that he was "with her right now." Eventually, after Mr. Tengen indicated that A.M. was unreceptive, appellant told Mr. Tengen, "Nevermind [*sic*] don't ask her nothing cuz this not going anywhere." Appellant also said, "I'm not even supposed to be asking you to talk to her cuz they might lock me up for it."

At trial, appellant objected to the admission in evidence of a certified copy of the stay away order, on the ground that it was not dated. In overruling that objection, the judge acknowledged that the absence of a date on the order was "odd," but took judicial notice that the Superior Court case docket showed that the stay order was entered on April 19, 2014.

### B.    The Alibi

Appellant maintained in his testimony at trial that at the time of A.M.'s assault, around 6:15 p.m. on February 19, he was watching Mr. Turner coach a recreational basketball team at Riggs LaSalle Recreation Center ("Riggs"). The evidence appellant offered in support of this alibi defense included a series of text messages to and from appellant on February 19, and an Instagram photo purportedly taken of him on that evening.

At 4:26 p.m. on February 19, Mr. Turner texted appellant that he would be coaching games at Riggs at 6:00 p.m. and 7:40 p.m. that evening. Appellant

responded at 4:27 p.m. that he would "prolly come meet" him. At 5:38 p.m., appellant texted another friend, "I'm bouta head up [to] Riggs to watch Rob [i.e., Mr. Turner] coach." The message log also shows that Mr. Turner called appellant at 5:44 p.m.

The Instagram photograph was a picture of someone's feet in basketball shoes on a basketball court. Appellant maintained the photo was of him and was taken on February 19 when he was at the Riggs Road basketball court that night.

On June 17, 2014, Mr. Turner testified before the grand jury. He previously had told the prosecutor that he, appellant, Mr. Tengen, and their friend Robert Price were playing basketball at "Riggs Park" when A.M. was assaulted. He also had said they took a photo of "some shoes, Nikes," that night and posted it on Instagram. Before the grand jury, however, Mr. Turner admitted that was all a "bogus story." He testified that Mr. Price came up with the alibi for appellant, and that he and appellant agreed to go along with it. He also admitted that he told the prosecutor "the wrong date" for the photograph; it was not taken the night of the assault.

In his testimony at trial, Mr. Turner disavowed his admissions in the grand jury. He claimed the actual "bogus story" was that appellant assaulted A.M., and "the truth" was that he and appellant were playing basketball that night at the time of the assault. The government impeached Mr. Turner with his grand jury testimony.

Despite his disavowal of it, Mr. Turner acknowledged that he, Robert Price, and appellant "had an agreement that you were supposed to testify in grand jury that you were at the LaSalle Recreation Center on Riggs Road [*sic*]." He said that when Mr. Price proposed the basketball story, appellant's "reaction was to agree to go along with it." The government also presented testimony from a detective that the Instagram photo actually was taken on February 5 (two weeks before the assault on A.M.).

### C.    The Contempt and Obstruction of Justice Counts

Count 4 of the indictment charged appellant with criminal contempt for violating the stay away order "on or about April 30, 2014" by "asking another individual to make contact with A.M."[6]

---

[6] Count 4 reads as follows:

> On or about April 23, 2014, within the District of Columbia, George Francis was released in Case Number 2014 CF 16915 and ordered by a D.C. Superior Court Judge or Magistrate Judge to stay away from A.M. (a 17-year-old female). On or about April 30, 2014 within the District of Columbia, George Francis knowingly, willfully, and intentionally violated that order by asking another individual to make contact with A.M. (Contempt, in violation of 11 D.C. Code, Section 944(a) (2001 ed.)).

For agreeing with Mr. Turner and Mr. Price to present a false alibi, Count 6 of the indictment charged appellant with conspiring with two unindicted co-conspirators "[b]etween on or about March 24, 2014 and on or about May 15, 2014," to obstruct justice.[7]

The fifth count of the indictment charged appellant with obstruction of justice. The count repeats the language of the obstruction statute but does not include a factual allegation of the manner in which appellant allegedly committed the offense. Count 5 states only that:

> On or about April 30, 2014, within the District of Columbia, George Francis did corruptly and by threat of force obstruct, impede or endeavor to obstruct and impede the due administration of justice in any official proceeding. (Obstructing Justice (Due Administration of Justice) in violation of 22 D.C. Code, Section 722(a)(6) (2001 ed.)).

---

[7] Count 6 reads as follows:

> Between on or about March 24, 2014 and on or about May 15, 2014, within the District of Columbia, George Francis, together with two unindicted co-conspirators, did knowingly and willfully combine, conspire, confederate and agree together to obstruct justice, in violation of Title 22, District of Columbia Code, Sections 1805a, 722(a)(6)).

In the proceedings below, the prosecutor appeared to evince some confusion or uncertainty as to the factual underpinnings of this charge. At a pretrial conference, the prosecutor noted that counts 4 and 5 alleged the same offense date of (on or about) April 30, 2014, while count 6 alleged a conspiracy between March 24 through May 14, 2014, and that those were the dates to be used in listing the counts for the jury on the verdict form.[8] And during trial, in a discussion outside the jury's hearing concerning the admissibility of the text messages between appellant and Mr. Tengen, the prosecutor told the judge that "[t]hese text messages go to the contempt charge and also the obstruction of justice charge."[9]

The following day, however, on November 14, 2017, the prosecutor told the jury in closing argument that appellant "committed obstruction of justice when he and his friends got together and agreed to concoct a story about where they were on February 19, 2014 using that Instagram photograph that's in evidence of those

---

[8] There was no discussion then as to the conduct that constituted the gravamen of Count 5.

[9] The judge, evidently, thought otherwise. Later that same day, in denying appellant's motion for judgment of acquittal, the judge said, "[J]ust to be clear by the way, about the obstructing justice and conspiracy [charges], that Mr. Turner testified that there was a — that there was a discussion at LaSalle Recreation Center about what the story is." Read in context, we understand the judge to have been expressing the understanding that Counts 5 and 6 both were based on the alleged agreement to fabricate an alibi for appellant. Neither counsel took issue with that understanding.

shoes." The prosecutor described the Instagram photo as "the picture that sets up the conspiracy" and "the picture that sets up the obstruction." The prosecutor did not argue that the messages to Mr. Tengen or the overture to A.M. on April 30 constituted the charged obstruction of justice. Nor did the prosecutor argue that they were overt acts in furtherance of the conspiracy to obstruct justice. In response, appellant's counsel did not dispute that the obstruction of justice charge was based on the allegedly false alibi and the Instagram photo, and he framed his argument for an acquittal on that understanding.[10] When he addressed Mr. Tengen's contact with A.M. on appellant's behalf, he did not even mention the obstruction charge.

After retiring to deliberate, the jury sent back a note seeking clarification of the obstruction charge. The note said, "[W]e're trying to decide charge five but we don't have any evidence," and asked, "[w]ould the [Instagram] photo be considered evidence for charge five?" With the approval of both the prosecutor and appellant's counsel, the judge explained to the jury that she could not tell them "what evidence there is for each particular charge," but only "that in reviewing the charges you

---

[10] Appellant testified at trial that his alibi defense was the truth and that the Instagram photograph was taken of him on the evening of February 19. In closing, appellant's counsel argued that appellant "testified today that that photograph was from February 19, 2014. He believes it. You have no idea how that was presented to him. There's no reason to believe that he was involved in any conspiracy or that he tried to obstruct justice."

should look at all of the evidence in the case." Neither counsel argued that the Instagram photo was irrelevant to Count 5.

## II.

Appellant raises a number of challenges to his convictions. We discuss them with respect to each count individually.

### A.     Contempt

Contempt requires "both a contemptuous act and a wrongful state of mind."[11] "Thus, to prove criminal contempt that rests on violation of a court order, 'the government must present evidence proving beyond a reasonable doubt that defendant engaged in: (1) willful disobedience (2) of a protective court order.'"[12] Appellant argues that the evidence at trial was insufficient to prove he willfully disobeyed the stay away order, and that the trial judge erred in admitting that order in evidence.

---

[11] *Williams v. United States*, 51 A.3d 1273, 1278 (D.C. 2012) (quoting *Davis v. United States*, 834 A.2d 861, 866 (D.C. 2003)).

[12] *Id.* (quoting *Ba v. United States*, 809 A.2d 1178, 1183 (D.C. 2002)).

## 1.     Willful Disobedience

In assessing appellant's first contention, we review the evidence in the light most favorable to the verdict and will reverse only "where there is no evidence upon which a reasonable mind could fairly conclude guilt beyond a reasonable doubt."[13] A defendant willfully disobeys a court order when he understands the order and intentionally commits an act that violates it.[14]  We find the evidence sufficient to prove this.

The stay away order unambiguously and emphatically directed appellant "to have no contact" with A.M. "by any means whatsoever" and "not [to] communicate or even attempt to communicate" with her "either directly or through any other person."  That appellant signed the order is sufficient evidence to prove he received and understood it.[15]  Appellant confirmed his understanding of the stay away order

---

[13] *Morales v. United States*, 248 A.3d 161, 185 (D.C. 2021) (quoting *Stroman v. United States*, 878 A.2d 1241, 1244 (D.C. 2005), and *Harris v. United States*, 668 A.2d 839, 841 (D.C. 1995)).

[14] *Williams*, 51 A.3d at 1280.

[15] *Cf. In re Dixon*, 853 A.2d 708, 711–12 (D.C. 2004) (determining that it was "essentially frivolous" for appellant to argue that he "did not understand the implications of the CPO when he was personally served with a copy of it" and where "there was no indication that appellant had any difficulty in understanding what it said").

when he texted Mr. Tengen that "I'm not even supposed to be asking you to talk to her cuz they might lock me up for it."

Appellant's text messages also evidenced his disobedience of the stay away order. In them he asked whether Mr. Tengen had talked to A.M. yet, gave Mr. Tengen a message to convey to her ("explain to her that they [are] blaming the wrong person and ask if she can talk to my lawyer"), and confirmed that Mr. Tengen was relaying it to her.

Appellant argues he did not communicate willfully with A.M., but the argument's footing is unclear. He seems to rely in part on Mr. Tengen's testimony that A.M. initiated the contact with him. A.M. testified to the contrary, but even if she did approach Mr. Tengen, that fact is irrelevant. Appellant was still forbidden to use Mr. Tengen as an intermediary to communicate with her.[16] Appellant also relies on the fact that he texted Mr. Tengen, "[n]evermind, don't ask her nothing." However, he sent that text only after Mr. Tengen had relayed appellant's message to A.M. At that point, appellant could not unring the bell.

---

[16] Indeed, even if A.M. had initiated contact directly with appellant, he would have been obligated to terminate the contact without otherwise speaking with her. *See Holmon v. District of Columbia*, 202 A.3d 512, 521 (D.C. 2019).

We hold that reasonable jurors had sufficient evidence to find that appellant willfully disobeyed the stay away order.

## 2. Admission of the Stay Away Order in Evidence

Appellant next takes aim at the stay away order itself. He contends it was error to admit an undated order in evidence, and error to take judicial notice of the date of the order based on a docket entry that was uncertified. We review both decisions for abuse of discretion,[17] and find none.

That the stay away order was undated is not, in itself, an absolute bar to its admission in evidence.[18] The date the order was entered and communicated to appellant determines, of course, whether the order was operative and appellant knew of it at the relevant time (i.e., April 30, when he disobeyed it). But there is no reason to think — and appellant provides us none — that the proponent of the order cannot

---

[17] *Jones v. United States*, 17 A.3d 628, 631 (D.C. 2011).

[18] The two cases appellant cites in support of such a bar are inapposite; in each, this court upheld admission of an order that did happen to be dated, but nothing in either case turned on that fact. *See Jackson v. United States*, 924 A.2d 1016, 1019–22 (D.C. 2007) (holding that admission of certified docket entries and a "notice to return" did not violate the appellant's rights under the Confrontation Clause); *(Loretta) Smith v. United States*, 677 A.2d 1022, 1025 (D.C. 1996) (holding, *inter alia*, that the appellant had notice of facts constituting a contempt charge).

prove its date with extrinsic evidence. After all, "a piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence."[19]

The "corroborating evidence" in this case was the docket entry stating the order was entered at appellant's presentment on April 19. Docket entries are judicial records, and "[i]t has long been settled that a court may take judicial notice of its own records."[20] For example, in *Daniels v. United States*, the court permissibly took judicial notice of appellant's release status after it "consulted CourtView, the official online record system of the Superior Court."[21] The docket that the trial judge consulted here is no less "a record system of the Superior Court" than CourtView. The judge was permitted to take judicial notice of it.

---

[19] *Jenkins v. United States*, 80 A.3d 978, 995 n.43 (D.C. 2013) (quoting *Bourjaily v. United States*, 483 U.S. 171 (1987)).

[20] *Daniels v. United States*, 33 A.3d 324, 330 (D.C. 2011).

[21] *Id.* at 329; *see also, e.g.*, *Washington v. United States*, 760 A.2d 187, 194–95 (D.C. 2000) (judicial notice of a civil protection order was proper, where the order was entered by another Superior Court judge in an earlier case between the defendant and the complainant he was charged with stalking).

Appellant argues that Superior Court Civil Rule 44 requires that a docket entry be certified as a prerequisite to its admissibility.[22] Rule 44 ("Proving an official record") lists several means of proving otherwise admissible official records and entries in such records. One of those means is to provide a copy attested by the record custodian and accompanied by a certificate of custody under seal.[23] However, Rule 44 also provides that "[a] party may prove an official record — or an entry or lack of entry in it — by any other method authorized by law."[24] We understand judicial notice of the Superior Court's own records to be such an "other method authorized by law."

We conclude that the trial judge could take judicial notice of the docket entry confirming that the stay away order was in effect on April 30, when appellant attempted to communicate with A.M. with the help of Mr. Tengen. The judge therefore did not abuse her discretion by admitting the order in evidence.

---

[22] Superior Court Criminal Rule 27 provides that "[a] party may prove an official record, an entry in such a record, or the lack of a record or entry in the same manner as in a civil action."

[23] Super. Ct. Civ. R. 44(a)(1)(B).

[24] Super. Ct. Civ. R. 44(c).

## B.    Obstruction of Justice

Appellant claims his conviction for obstruction of justice cannot stand for two reasons.    First, he contends, the government's proof at trial amounted to a constructive amendment of, or a prejudicial variance from, the obstruction of justice charged in Count 5.    Second, he argues that the evidence is insufficient to support his conviction for obstruction of justice.

### 1.    Constructive Amendment or Variance

Appellant claims Count 5 of the indictment charged him with obstruction of justice based on the evidence of his contact (through Mr. Tengen) with A.M. on April 30, 2014.  At trial, however, the government asked the jury to convict appellant on Count 5 on an entirely different evidentiary basis, namely, its proof of appellant's reliance on a fabricated alibi to derail the grand jury's investigation and counter his prosecution.  Appellant argues that this deviation resulted in either a constructive amendment of Count 5 or a prejudicial variance in the evidence used to prove it.

"Constructive amendment" is a term that has been defined in various ways in our case law, but for present purposes it suffices to reiterate the principle this court "formally adopt[ed]" in *Carter v. United States*:  "A constructive amendment of the indictment occurs if, *and only if*, the prosecution relies at trial on a complex of facts

distinctly different from that which the grand jury set forth in the indictment."[25]  We employ the term "variance," on the other hand, for lesser deviations — commonly, "when the facts proved at trial materially differ from the facts alleged in the indictment but the essential elements of the offense are the same."[26]  If an appellant has preserved the claim by timely objection at trial, a constructive amendment of the indictment "mandates" reversal without the need for a showing of prejudice, while "a mere variance" does not warrant reversal unless prejudice is shown.[27]

---

[25]  *Carter v. United States*, 826 A.2d 300, 306 (D.C. 2003) (emphasis in the original) (quoting *Robinson v. United States*, 697 A.2d 787, 789–90 (D.C. 1997)); *accord Tann v. United States*, 127 A.3d 400, 451 (D.C. 2015) (quoting *Baker v. United States*, 867 A.2d 988, 999 (D.C. 2005)).

[26]  *Carter*, 826 A.2d at 304 (brackets omitted) (quoting *Ingram v. United States*, 592 A.2d 992, 1006 (D.C. 1991)); *accord Marshall v. United States*, 15 A.3d 699, 710 (D.C. 2011).  We have said that a variance may "become[] a constructive amendment when facts introduced at trial go to an *essential element* of the offense charged, and the facts are different from the facts that would support the offense charged in the indictment."  *Carter*, 826 A.2d at 304 (emphasis in original) (quoting *Johnson v. United States*, 613 A.2d 1381, 1384 (D.C. 1992)).

[27]  *Zacarias v. United States*, 884 A.2d 83, 86–87 (D.C. 2005).  "[A] variance is prejudicial if it either deprives the defendant of an adequate opportunity to prepare a defense — i.e., fails to give him proper notice of the crime with which he is charged — or exposes him to the risk of another prosecution for the same offense, which would violate the Double Jeopardy Clause of the Constitution."  *Id.*

Appellant did not object at trial to the inconsistency he now asserts between his indictment and the government's proof. Consequently, we review his claim only for plain error.[28] "Under plain error review, appellant must show that (1) there was an error, (2) the error was plain, and (3) the error affected his substantial rights."[29] An error is plain when it is "clear or obvious, rather than subject to reasonable dispute."[30] "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."[31] For the following reasons, we conclude that appellant has not shown plain error, or, indeed, error at all.

To show either a constructive amendment or a variance, appellant must demonstrate that the prosecution deviated from the facts on which Count 5 is based when it relied at trial on the evidence of a fabricated alibi to prove obstruction of

---

[28] *Portillo v. United States*, 62 A.3d 1243, 1258 (D.C. 2013); *(Alexander) Smith v. United States*, 801 A.2d 958, 961–62 (D.C. 2002).

[29] *Portillo*, 62 A.3d at 1258 n.17 (quoting *Little v. United States*, 989 A.2d 1096, 1100 (D.C. 2010)).

[30] *In re Taylor*, 73 A.3d 85, 99 (D.C. 2013) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

[31] *Portillo*, 62 A.3d at 1258 n.17 (quoting *Thomas v. United States*, 914 A.2d 1, 8 (D.C. 2006)).

justice. Ultimately, this is an insurmountable barrier for appellant, because Count 5 does not set forth the facts on which it is based.

Appellant argues that a comparison of the date allegations in the three counts of conviction establishes that the grand jury *must* have based Count 5 on his contact with A.M. rather than on his fabricated alibi. Count 5 charges appellant with obstructing justice "on or about April 30, 2014." Count 4 likewise charges him with contempt for contacting A.M. "on or about April 30, 2014." Count 6, on the other hand, charges appellant with conspiracy to obstruct justice by creating a false alibi "[b]etween on or about March 24, 2014 and on or about May 15, 2014." Appellant reasons that the identical dates in Counts 4 and 5 and different dating in Count 6 must mean that Counts 4 and 5 are based on the same conduct, i.e., the contact with A.M., while Count 6 is based on a different set of facts, i.e., the concoction of an alibi. This is not enough to persuade us there was a plain, inarguably erroneous inconsistency, amounting to a constructive amendment or variance, between the offense charged in Count 5 and the prosecution's proof at trial.

For one thing, although the dates in Counts 4 and 5 match, the rest of Count 5 points towards construing it to involve the same conduct as Count 6. Count 5 charges obstruction of justice, Count 6 charges conspiracy to obstruct justice, and the two counts cite the same statutory provision criminalizing obstruction, D.C. Code § 22-722(a)(6). (Count 4 does not cite that provision.) The charged conspiracy

involved the fabrication of an alibi, and the evidence showed this conspiracy was not merely inchoate; it was carried out. It thus would be incongruous for the grand jury to have charged appellant with conspiring to obstruct justice in one way while charging him with actually obstructing justice in an entirely different way. We think it more likely that the same conduct was the root of both charges.

The date alleged in Count 5 does not clearly show otherwise. Although April 30, 2014, is the exact date appellant contacted A.M., it is not inconsistent with, but rather falls within, the time period in which appellant allegedly conspired in the creation of a false alibi. "[W]hen an indictment charges that the offense occurred 'on or about' a certain date, . . . [t]he evidence will conform to the indictment . . . if it establishes that the offense was committed on a date reasonably close to the one alleged."[32] At least in some circumstances, "on or about" can even cover a period several months before or after the date specified. We have said, for example, that September 15, 2007 "was reasonably close" to February 21, 2008, despite a disparity

---

[32] *Ingram v. United States*, 592 A.2d 992, 1007 (D.C. 1991); *see also In re Nave*, 197 A.3d 511, 516 (D.C. 2018) ("[T]his court's case law establishes that 'the phrase "on or about" encompasses more than the days immediately before and after the date alleged in [a charging document].'" (quoting *In re E.H.*, 967 A.2d 1270, 1274 n.6 (D.C. 2009)).

of over five months.[33]   Here, the dates are far closer.  Count 5 alleges obstruction

that occurred "on or about April 30."   The government presented evidence that

appellant and his friends agreed to the false alibi between roughly March 24 and

May 15, as alleged in Count 6.[34]  That period bracketed April 30 by only two to five

weeks on either side.  The government's proof at trial thus conformed with the

charge that appellant obstructed justice "on or about April 30."

We thus have a situation where the text of Count 5 does not clarify which

conduct the grand jury had in mind in charging appellant with obstruction of justice,

and the government's proof at trial was consistent with the text of Count 5.  In such

circumstances, we previously have rejected claims of a constructive amendment or

variance.

For example, in *O'Brien v. United States*, the appellant was charged with

obstruction of justice for telling "witnesses" to withhold information, but the

---

[33]   *Lee v. District of Columbia*, 22 A.3d 734, 743 (D.C. 2011); *see also, e.g.*, *Pace v. United States*, 705 A.2d 673, 676–78 (D.C. 1998) (no prejudicial variance where indictment charged that offense occurred on or about April 1994 and trial evidence established that offenses occurred "sometime during five-month period between late December 1993 and late May 1994.").

[34]   Appellant does not contend that the false alibi agreement did not occur within this date range.

indictment did not specify who the "witnesses" were or what the information was.[35] At trial, the government presented evidence that the appellant told a specific witness to stick to a specific story.[36] Although the appellant contended that the grand jury had in mind a different witness and a different story, we found that there was "no material difference between the trial evidence and the specific words of the indictment."[37] Thus, we rejected the appellant's constructive amendment and variance claims.[38]

Similarly, in *Williams v. United States*, the indictment charged the appellant with engaging in sexual intercourse with a minor "on or about" a certain month.[39] The appellant claimed the government constructively amended the indictment by proving "a routine of sexual offenses that were nonspecific as to date or activity."[40] We disagreed. Although there was a "lack of clarification as to what facts form the

---

[35] 962 A.2d 282, 320–21 (D.C. 2008).

[36] *Id.*

[37] *Id.*

[38] *Id.* at 321.

[39] 756 A.2d 380, 388 (D.C. 2000).

[40] *Id.* at 389

basis of the grand jury charges," there was no "divergence" between the text of the indictment and the government's proof at trial.[41]

Here too, appellant has not clearly established a divergence between the facts on which the grand jury predicated the charge at issue and the government's proof of that charge at trial. Appellant therefore has not shown the trial court plainly erred by permitting a constructive amendment or a variance.

To the extent appellant argues the putative divergence affected his substantial rights, we disagree. He asserts only that his "right to notice of the charges" was violated, and that (assuming *arguendo* there was a constructive amendment) he was "convicted of an offense with which he has not been charged." Neither contention is persuasive. If appellant thought Count 5 was insufficiently specific, he "could have objected to the indictment or request[ed] a bill of particulars.[42] But we doubt he thought that, or that he was misled. The trial record belies any notion that appellant was surprised when the government attempted to prove Count 5 based on

---

[41] *Id.* at 388–89.

[42] *Williams*, 756 A.2d at 388; *see also Hsu v. United States*, 392 A.2d 972, 977 (D.C. 1978) (noting that Superior Court Criminal Rule 7(c), which governs the particularity required in indictments, "cast[s] some of the burden on a defendant to pursue additional details, if needed, by way of a bill of particulars").

the false alibi. His counsel did not object to the prosecutor's closing argument, nor did he express concern when the jury sent a note suggesting that it might rely on the Instagram photo as probative evidence of the obstruction charge; rather, appellant approved an instruction that the jury could "look at all of the evidence." And appellant has not identified any way in which the putative constructive amendment or variance affected his defense.[43]

## 2. Sufficiency

Appellant claims that the evidence was insufficient to support his conviction for obstruction of justice regardless of the set of facts on which the jury based its decision. Viewing the evidence, as we must, in the light most favorable to the verdict, and therefore "giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact,"[44] we are satisfied the evidence sufficed to convict appellant of the offense.

---

[43] *Zacarias*, 884 A.2d at 88 ("Appellant cannot show prejudice in this case because his defense was unaffected by the variance.").

[44] *Silver v. United States*, 73 A.3d 1022, 1028 (D.C. 2013) (quoting *Moore v. United States*, 927 A.2d 1040, 1049 (D.C. 2007)).

To prove obstruction of justice in violation of D.C. Code § 22-722(a)(6), "the government had to show that [appellant] (1) obstructed or impeded or endeavored to obstruct or impede the due administration of justice in an official proceeding, and (2) did so with the intent to undermine the integrity of the pending investigation."[45] "The use of the term 'endeavor' [in the obstruction of justice statute] does not require success or even an overt attempt; it merely requires that the defendant have made 'any effort or essay to accomplish the evil purpose that the [statute] was enacted to prevent.'"[46] Evidence of the requisite intent can be circumstantial, that is "inferred from the context and nature of the alleged criminal conduct."[47]

The government presented the jury with portions of Mr. Turner's grand jury testimony in which he admitted under oath having told the prosecutor a "bogus story" that he and appellant were playing basketball at Riggs when A.M. was assaulted. To corroborate that story, Mr. Turner had claimed the Instagram photo of appellant's shoes was from that night, but he admitted before the grand jury that he

---

[45] *(Alton) Smith v. United States*, 68 A.3d 729, 742 (D.C. 2013).

[46] *Irving v. United States*, 673 A.2d 1284, 1289 (D.C. 1996) (quoting *United States v. Russell,* 255 U.S. 138, 143 (1921), and *United States v. Jackson*, 513 F.2d 456, 460 (D.C. Cir. 1975)).

[47] *(Alton) Smith*, 68 A.3d at 742 (quoting *Campos-Alvarez v. United States*, 16 A.3d 954, 965 (D.C. 2011)).

had given "the wrong date." The photo was actually taken two weeks before the assault. Mr. Turner also testified that Mr. Price came up with the bogus story and appellant agreed to go along with it.

At trial, Mr. Turner disavowed his grand jury testimony and claimed the basketball story was "the truth." He nonetheless agreed that he, Mr. Price, and appellant "had an agreement that you were supposed to testify in grand jury that you were at the LaSalle Recreation Center on Riggs Road." He also confirmed that when Mr. Price proposed the basketball story, appellant's "reaction was to agree to go along with it."

The jury could credit Mr. Turner's testimony and find that appellant agreed to go along with a plan to mislead the grand jury with a fabricated alibi. This was sufficient to support a finding that appellant endeavored to impede the due administration of justice in an official proceeding with the intent to undermine the integrity of the pending grand jury investigation.[48] While there is no testimony that appellant pressured or even asked Mr. Turner to lie to the grand jury, he did not have to do so; appellant's connivance in the corrupt plan was enough.

---

[48] *Cf. Silver*, 73 A.3d at 1028 (evidence that appellant pressured another individual to lie to police held sufficient to support conviction of obstruction of justice under D.C. Code § 22-722(a)(6)).

Against this conclusion, appellant argues only that text messages between him and Mr. Turner on the night of the assault proved he was playing basketball at the time of the offense, and therefore the alibi was legitimate (even if, allegedly unbeknownst to appellant, the Instagram photo was not genuine evidence of it). The text messages are not so probative, however. Mr. Turner told appellant at 4:26 p.m. that he would be coaching games at 6:00 and 7:40 p.m. that night. Appellant responded at 4:27 p.m. that he would "prolly come meet" him. At 5:38 p.m., appellant texted, "I'm bouta head up [to] Riggs to watch Rob [i.e., Mr. Turner] coach." The alleged assault occurred around 6:15 p.m. Viewed in the light most favorable to the government, the text messages establish only that appellant intended to go to the Riggs Road recreation center, not that he was actually *at* Riggs during the assault. Thus, reasonable jurors could find the texts did not confirm appellant's alibi or refute the government's evidence.[49]

---

[49] All the more so in light of the evidence that appellant and Mr. Turner were identified as suspects from video surveillance footage recorded near the scene, and that Mr. Turner admitted to police and in his grand jury testimony that he and appellant were at the alley and that appellant had attacked A.M. there. We take this into account for purposes of gauging the sufficiency of the evidence, even though the jury may not have credited some or all of it. *See Koonce v. United States*, 993 A.2d 544, 551 (D.C. 2010) ("[I]n evaluating the sufficiency of the evidence, 'we consider *all* the evidence admitted at trial.'" (emphasis in original) (quoting *Moore v. United States*, 927 A.2d 1040, 1049 (D.C. 2007))); *Jones v. United States*, 716 A.2d 160, 164 (D.C. 1998) ("So long as the evidence was sufficient to support the

### C.     Conspiracy to Obstruct Justice

Appellant also contends his conviction for conspiracy to obstruct justice was based on insufficient evidence. We disagree. "To prove conspiracy, the government must establish that an agreement existed between two or more people to commit a criminal offense; that the defendant[s] knowingly and voluntarily participated in the agreement, intending to commit a criminal objective; and that, in furtherance of and during the conspiracy, a co-conspirator committed at least one overt act."[50]

Mr. Turner testified that he, appellant, and Mr. Price "had an agreement" to rely on a false alibi, and that he — a co-conspirator — took the overt step of actually telling the prosecutor the "bogus story." Absent any reason to think Mr. Turner entered into the agreement unknowingly, we find this evidence sufficient to support the conspiracy conviction.

### III.     Conclusion

In sum, we hold that (1) the trial court did not err by taking judicial notice of the undated stay away order and admitting it in evidence; (2) appellant has not shown

---

conviction in question, the fact that the jury acquitted the appellant of certain related counts does not invalidate the conviction.").

[50] *Tann*, 127 A.3d at 424.

the trial court plainly erred by tolerating a constructive amendment or variance with respect to Count 5 of the indictment; and (3) appellant's convictions for contempt, obstruction of justice, and conspiracy to obstruct justice are supported by sufficient evidence.  The judgment of the Superior Court is

*Affirmed.*